UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

Esteban Gonzalez,

          Plaintiff,

          v.

Warden Dennis W. Hasty, et al.,

          Defendants.

--------------------------------------------------------------X

05-cv-6076(BMC)

PLAINTIFF GONZALEZ'S
RESPONSE TO THE
MOVING DEFENDANTS'
LOCAL RULE 56.1
STATEMENT.

          Pursuant to Local Rule 56.1 of the United States District Court for the Eastern District of New York, plaintiff Esteban Gonzalez submits the following response to the defendants' Local Rule 56.1 Statement.

          Plaintiff respectfully submits that the defendants' Rule 56.1 Statement should be accorded no weight by the Court because it violates Local Rule 56.1, the Individual Practices of this Court and this Court's Corrected Order dated February 20, 2013.  Your Honor's corrected order stated:

> CORRECTED ORDER denying as moot Motion for Premotion Conference. The premotion conference is waived. <u>If the parties mutually agree, the Court will deem their letters to constitute the memoranda of law in support and in opposition to the motion. If the parties agree to do so, defendants are directed to file such documents, if any, as are necessary to constitute a record for the motion by 2/27/13, together with a non-argumentative affidavit that merely authenticates them</u>, and plaintiff may file any additional documents by 3/5/13 in like manner. (See this Court's Individual Practice Rules). Defendants may then file a reply letter to plaintiff's letter by 3/12/13. In the absence of an agreement to use the letters in this manner, the same schedule will apply, except that the parties shall file memoranda of law together with any

documents. Ordered by Judge Brian M. Cogan on 2/20/2013.
(Cogan, Brian) (Entered: 02/20/2013) (emphasis added).

Plaintiff's counsel proposed to the defendants' counsel that the parties agree to the first alternative offered by the Court.  On February 21, 2013, defendants' counsel stated in an email to plaintiff's counsel that the defendants agreed to that alternative.  The defendants, however, subsequently filed documents which were in complete violation of the Court's order.  Instead of limiting themselves to filing documents necessary to constitute a record for the motion together with a non-argumentative affidavit which merely authenticates those documents, the defendants instead filed a lengthy Rule 56.1 statement and an affidavit by Crista Colvin, both of which go far beyond the mere authentication of documents and instead contain a plethora of argumentative statements.

In addition to violating this Court's order, the defendants' submissions violate Local Rule 56.1 and this Court's Individual Practices.  Local Rule 56.1 requires that the defendants, in filing a Rule 56.1 statement,  limit themselves to "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."   This Court's Individual Practices specifies that:

> Each paragraph in the Local Rule 56.1 statement shall contain an assertion of a material undisputed fact, not a description of evidence.  For example: "John Smith testified at deposition that he crossed the street" is not a statement of fact.   That statement of fact is "John Smith crossed the street."

The documents submitted by the defendants are far from "a separate, short and concise statement."  Moreover, almost all of the paragraphs of defendants' Rule 56.1 statement do not constitute "an assertion of a material undisputed fact" but rather are the sort of "description of evidence" that this Court proscribed.  Almost all of the paragraphs in

the defendants' 56.1 statement begin by saying that a Bureau of Prisons document contains certain factual allegations and are thus are indistinguishable from the example of an unacceptable 56.1 statement given by this Court - "John Smith testified at deposition that he crossed the street."  Plaintiff does not dispute that most or all of the documents referenced in the beginning of each of these statements exist, but does dispute most of the factual allegations contained in those documents, and also maintains that the documents were not prepared on the dates indicated, and that some of the documents are unsigned or contain forged signatures.

As a result, plaintiff, rather than simply saying whether he disputes or does not dispute defendants' statements, has been obliged to give explanations of what he does and does not dispute in multiple factual allegations contained in the evidence referenced in each of the defendants' statements.  Plaintiff has also included a Separate Statement Of Additional Material Facts Alleged To Be In Dispute.

Plaintiff wishes to point out that he is unable to provide documents to refute the defendants' claims or support his own Statement of Disputed Facts because the defendants have steadfastly refused to provide him with the discovery to which he is entitled under clearly established federal caselaw in order adequately to rebut the defendants' factual claims in support of their dismissal and summary judgment motions (see eg. Memorandum in Support of Plaintiff's Motion to Compel Discovery, filed on 2/15/2 at p. 17; see also Plaintiff's letter of discovery requests to the defendants dated January 21, 2013, which is attached to plaintiff's letter (later deemed memorandum) to your Honor dated February 20, 2013).  Consequently, the main document which plaintiff relies upon is his amended complaint.

Finally, plaintiff raises a continuing objection to all of the factual allegations made in the declarations of Crista Colvin and subsequently relied upon by the defendants because Ms. Colvin was not present at MCC or MDC during any of the period that plaintiff was confined to SHU in those facilities, and consequently has no personal knowledge as to the many factual assertions which she makes in her declarations.

Paragraph A1.

"On March 2, 1994, Plaintiff was arrested for possession of a firearm after having previously been convicted of a felony and was placed into federal custody at the Metropolitan Correctional Center ("MCC") in Manhattan, NY. *Gonzalez v. Hasty*, No. 05 Civ. 6076, 2012 WL 4473689 at *3 (S.D.N.Y. Sept. 28, 2012) *citing United States v. Gonzalez*, No. 94 Crim. 134 (S.D.N.Y. 1994). ECF Nos. 4, 16. On November 1, 1994, a jury sitting in the United States District Court for the Southern District of New York found plaintiff guilty of one count of possession of a firearm after having previously been convicted of a felony. *Id.* Thereafter, plaintiff was sentenced. *Id."*

Plaintiff does not dispute these allegations and further clarifies that plaintiff

Gonzalez was originally arrested by New York City police in connection with the events

relating to the charges in <u>United States v. Gonzalez</u>, No. 94 Cr. 134 (S.D.N.Y.) on February

24, 1994 and that he was subsequently re-arrested by federal authorities on March 2, 1994.

Paragraph A2.

"On February 28, 1999, plaintiff repeatedly stabbed a fellow inmate at MCC with a knife-like object. *Id.* at *4 *citing United States v. Gonzalez*, 00 Crim. 447, 2001 WL 1580233 at *1 (S.D.N.Y. Dec. 12, 2001).1 That same day, plaintiff was placed in administrative detention in the Special Housing Unit ("SHU") of MCC. *Id.*; *see also* Declaration of Crista Colvin, dated June 14, 2012 ("Colvin 2012 Dec.") (Docket Entry No. 84 in this action) at ¶ 6 & Ex. 1 and Declaration of Crista Colvin, dated February 27, 2013 ("Colvin 2013 Dec.") at ¶ 5 & Ex. A.

Plaintiff disputes that he repeatedly stabbed a fellow inmate at MCC with a

knife-like object. Plaintiff does not dispute that he was placed in administrative detention

in the Special Housing Unit of MCC on February 28, 1999.

Paragraph A2, footnote 1.

"On December 7, 2000, a jury sitting in the United States District Court for the Southern District of New York found plaintiff guilty of assault with intent to do bodily harm, assault resulting in bodily injury, and possession of a prohibited object in prison; on January 22, 2002, plaintiff was sentenced. *Id."*

Plaintiff does not dispute this allegation and further alleges that the jury

acquitted him of the most serious charge in the indictment - assault with intent to murder.

Paragraph A3.

"Plaintiff remained in the MCC SHU until July 24, 2001, when he was transferred to the Metropolitan Detention Center in Brooklyn, New York ("MDC"). *Gonzalez*, 2012 WL 4473689 at \*6; *see also* Colvin 2012 Dec. at ¶ 6 & Ex. 1; Colvin 2013 Dec. at ¶ 6*."*

           Plaintiff does not dispute these allegations and further alleges that he was transferred from MCC SHU to MDC SHU at the order and direction of defendant warden Hasty.  Plaintiff also notes that the defendants have repeatedly refused plaintiff's request that he be provided with the documents pertaining to this transfer which would confirm this fact (see eg. Plaintiff's letter of discovery requests to the defendants dated January 21, 2013, which is attached to plaintiff's letter (later deemed memorandum) to your Honor dated February 20, 2013, at request # 5) .

Paragraph A4.

"Upon transfer from MCC to MDC, plaintiff was classified as a holdover inmate and placed in administrative detention in the MDC-SHU. Colvin 2013 Dec. at ¶ 6 & Ex. B; Colvin 2012 Dec. at ¶ 6 & Ex. 1."

           Plaintiff disputes this allegation and instead alleges that he was placed in MDC SHU upon his transfer from MCC to MDC at the order and direction of defendant warden Hasty, and that he was told - falsely as it is now clear -  that he was being placed in SHU "pending Captain's review."   See eg. Colvin Decl. 2013, Exhibit E at line 2; Id., Exh. F at p. 1, line 2.

Paragraph A5.

"Plaintiff remained in administrative detention at MDC until March 20, 2002. *Id.*  On March 20, 2002, plaintiff was transferred to USP-Lewisburg and placed in administrative detention, where he remained until April 9, 2002. Colvin 2013 Dec. at ¶ 7 & Exs. B, C; *see also* Colvin 2012 Dec. at ¶ 6 & Ex. 1."

           Plaintiff does not dispute this allegation and further alleges that he was transferred to USP-Lewisburg and held in administrative administration there at the

direction of defendant warden Hasty.  He also notes that the defendants have refused to provide him with any documents relating to the reason for this transfer to USP-Lewisburg, the reason for his placement in USP-Lewisburg SHU and who directed that he be transferred to  USP-Lewisburg and placed in the USP-Lewisburg SHU.

Paragraph A5, footnote 2.

"The Colvin 2012 Declaration incorrectly states that plaintiff was released into the general population from September 20, 2001 until October 18, 2001. (Colvin 2013 Dec. at ¶ 6, n. 1 citing to Colvin 2012 Dec. at ¶ 6.) As set forth in the Colvin 2013 Declaration, this was an inadvertent error. *Id.* Specifically, Exhibit 1 to the Colvin 2012 Declaration indicates that plaintiff was put in "House Z" on July 24, 2001, which is SHU. (Ex. 1 at p. 4.) Exhibit 1 also indicates that plaintiff was in "House K" from September 20, 2001 to October 18, 2001. (*Id.*) "House K" is a designation for a general population housing unit. However, after the events of September 11, 2001, MDC received a large number of detainees and used an additional housing unit as SHU, designated as "House K" in Ex. 1, for a limited period of time to accommodate the overflow. Plaintiff was held in this additional SHU housing unit during that time period. (*Id.*; *see also* Colvin 2013 Dec., Ex. F (SHU review forms during this time period).)"

Plaintiff does not dispute these allegations, with the exception that he lacks sufficient information to know, and therefore disputes, whether this false statement in the original Colvin Declaration was "inadvertent."

Paragraph A6.

"On April 9, 2002, plaintiff was released on federal writ to MCC where he remained in SHU while in transit. Colvin 2013 Dec. at ¶ 8 & Ex. B at p.2; *see also* Colvin 2012 Dec. at ¶ 6 & Ex. 1. On April 10, 2002, plaintiff arrived back to MDC where he again was housed in SHU from April 10, 2002 through April, 15, 2002. Colvin 2013 Dec. at ¶ 8 & Ex. B at p.2 & Ex. D; *see also* Colvin 2012 Dec. at ¶ 6 & Ex. 1."

Plaintiff does not dispute these allegations, except that he disputes that he was released from MDC SHU on April 15, 2002. He instead alleges that he was not released from MDC SHU until May 11, 2002.  Plaintiff clearly was not released from MDC SHU on April 15, 2002, since the BOP Central Office document contained in the defendants' own exhibits (Colvin declaration, 2012, at Exhibit 19) states that he was

released on May 10, 2002.   The one day difference between that date and May 11, 2002 was probably due to the fact that plaintiff Gonzalez was designated to be released from SHU on May 10, 2001 but was not actually released until the following morning.

Paragraph A6, footnote 3.

"After April 15, 2002, and the time period at issue in this litigation, plaintiff was released into the general population but thereafter spent certain periods of time in administrative detention or disciplinary segregation. *See* Colvin 2012 Dec. at ¶ 6."

Plaintiff disputes these allegations in part because he does not understand the meaning of the phrase "[a]fter April 15, 2002, and the time period at issue in this litigation."   Plaintiff also disputes that he was released to general population on April 15, 2002. (Colvin declaration, 2012, at Exhibit 19)

Paragraph B7.

"Plaintiff filed some seventy-one (71) requests for administrative remedies while incarcerated at MCC and MDC. *Gonzalez*, 2012 WL 4473689 at *5 *citing* Colvin 2012 Dec., Ex. 2. Six of those requests related directly to his alleged improper SHU confinement at MCC and MDC. *Id."*

Plaintiff disputes these allegations.   Instead, he alleges that he filed 128 requests for administrative remedies just during the period that he was housed in the SHU at MCC and MDC, all but a few of which related directly to his improper SHU confinement at MCC and MDC (see in part Colvin 2012 Dec., Exh. 2).

Paragraph B8.

"On May 2, 2000, plaintiff filed his first request for administrative remedy challenging his detention in the MCC-SHU. *Id. citing* Colvin 2012 Dec., Ex. 4. In his May 2, 2000 MCC administrative remedy request, plaintiff alleged that he had "been placed in . . . solitary confinement for no valid reason by order of Warden Hasty except to harass and punish [him] . . . without due process of law." *Id. citing* Colvin 2012 Dec., ¶ 12 & Ex. 4."

Plaintiff disputes that his first request for administrative remedy challenging his detention in the MCC SHU was filed on May 2, 2000.   He does not dispute that he did

file an administrative remedy request on that date which alleged in part that he had "been placed in . . . solitary confinement for no valid reason by order of Warden Hasty except to harass and punish [him] . . . without due process of law."   It should also be noted that the defendants rely on select MCC documents, but at the same time refuse to disclose all pertinent documents to plaintiff.

Paragraph B9.

"On May 22, 2000, this request was denied by the MCC Warden. Colvin 2012 Dec. at ¶ 12 & Ex. 5. On May 26, 2000, plaintiff submitted a Form BP-10 Regional Office Administrative Remedy appeal with BOP's regional office, challenging this determination. *Id.* at ¶ 13. It was denied by that office on June 23, 2000. *Id.* On July 18, 2000, plaintiff filed a Form BP-11 Central Office Administrative Remedy Appeal with BOP's main office, further appealing this determination. *Id.* at ¶ 14 & Ex. 6. It was denied on November 15, 2000. *Id.* at ¶ 14 & Ex. 7."

Plaintiff does not dispute these allegations.

Paragraph B10.

"On May 23, 2000, plaintiff filed a Form BP-9, asserting that he had been improperly held in administrative segregation at MCC for more than 90 days "under conditions that are atypical . . . which triggers due process protections" and that Warden Hasty had not received "authorization to suspend [his] due process rights," and demanding that he "be released from SHU immediately." *Id.* at ¶ 15 & Ex. 8. On June 12, 2000, this request was denied. *Id.* at ¶ 15 & Ex. 9. On June 20, 2000, plaintiff filed a Form BP-10 with BOP's regional office challenging this determination. *Id.* at ¶ 16 & Ex. 10. On July 21, 2000, this appeal was denied. *Id.* at ¶ 16 & Ex. 11. On August 24, 2000, plaintiff filed a Form BP-11 with BOP's central office, further appealing this determination. *Id.* at ¶ 17 & Ex. 12. This appeal was denied on November 15, 2000. *Id.* at ¶ 17 & Ex. 13."

Plaintiff does not dispute these allegations.

Plaintiff disputes the factual allegations contained in those denials.

Paragraph B11.

"With respect to his incarceration at MDC, plaintiff filed three requests for administrative remedies relating to his MDC-SHU confinement; those requests were dated February 14, 2002, February 22, 2002 and February 24, 2002. *Gonzalez*, 2012 WL 4473689 at *6 *citing* Colvin 2012 Dec. at ¶¶ 18, 21, 24 & Exs. 2, 14, 20, and 28.   The three requests were denied by the Bureau of Prisons ("BOP") Central Office on July 2, 2002, August 8, 2002, and June 20, 2002, respectively.   *Gonzalez*, 2012 WL 4473689 at *6 *citing* Colvin 2012 Dec. at      ¶¶ 20, 23, 26 & Exs. 19, 25, and 33.  The BOP Central Office stated that plaintiff "posed a threat to the security and good order of the institution";

'the Warden and the Regional Director ha[d] accurately and thoroughly responded to [Plaintiff's] issue[s]"; and "formal reviews and evaluations [of Plaintiff's confinement] were conducted pursuant to policy," respectively.  *Id.*"

Plaintiff disputes most of these allegations.  Although he does not dispute that he filed administrative remedies on the three dates listed, he disputes that those were the only administrative remedies which he filed relating to his confinement in MDC SHU.  He instead alleges that he filed 87 administrative remedy requests during the period that he was confined in MDC SHU, almost all of which related to his confinement in MDC SHU.  He does not dispute that the three administrative remedy requests referred to in this paragraph were denied, but has no knowledge, and therefore disputes, the dates on which they were denied.

As for the quotes attributed to the BOP Central office, plaintiff does not dispute that the three quoted phrases appeared - one in each of the cited documents.  He does, however, dispute the factual allegations contained in those phrases.  Specifically, he disputes that he "posed a threat to the security and good order of the institution'; he disputes that 'the Warden and the Regional Director ha[d] accurately and thoroughly responded to [Plaintiff's] issue[s]"; and he disputes that "formal reviews and evaluations [of Plaintiff's confinement] were conducted pursuant to policy."  He also maintains that the reviews, evaluations and other documents which were relied upon by BOP Central Office in making these allegations were themselves false.

Paragraph B12.

"Specifically, on February 14, 2002, plaintiff filed a Form BP-9 stating that two MDC officers had informed him that he would be released to the MDC general population were it not for the determination by Warden Hasty, now warden of the MDC, that he should remain in the SHU, asserting that Warden Hasty had no legitimate reason to hold him in the SHU and that he (plaintiff) had not been given a meaningful opportunity to contest his incarceration there pursuant to 28 C.F.R. § 541.22, and demanding his release.  *See* Colvin 2012 Dec. at ¶ 18 & Ex. 14.  On March 8, 2002,

this request was denied. *Id.* at ¶ 18 & Ex. 15. On March 12, 2002, plaintiff appealed this determination to the BOP regional office. *Id.* at ¶ 19 & Ex. 16. On April 22, 2002, the appeal was denied. *Id.* at ¶ 19 & Ex. 17. On May 2, 2002, plaintiff further appealed this determination to BOP's national office. *Id.* at ¶ 20 & Ex. 18. On July 2, 2002, this appeal was denied. *Id.* at ¶ 20 & Ex. 19."

Plaintiff does not dispute these allegations except to note that he does not know, and therefore disputes, the dates on which the various denials were made. He also disputes the factual allegations contained in those denials.

Paragraph B13.

"On February 22, 2002, plaintiff filed another Form BP-9 alleging that no periodic reviews were being conducted regarding his incarceration in the SHU and that the forms documenting such reviews were being forged by MDC staff, and further claiming that the administrative order confining him to the SHU was insufficiently detailed and that he was not given an opportunity to challenge it, and that the psychological reviews performed on him were inadequate. Colvin 2012 Dec. at ¶ 21 & Ex. 20. On April 8, 2002, this request was denied by MDC Warden Zenk. *Id.* at ¶ 21 & Ex. 21. Warden Zenk stated in the denial letter that "[a]n investigation revealed that the Segregation Review Officer has conducted formal reviews with you on a consistent basis. The reviewing official has informed you of your status as "High Security" and you[r] reason for placement in the Special Housing Unit.." *Id.* at Ex. 21."

Plaintiff does not dispute that he filed an administrative remedy request (BP-9) on February 22, 2002 in which he stated that no periodic reviews were being conducted regarding his incarceration in the SHU and that the forms documenting such reviews were being forged by MDC staff, and further claiming that the administrative order confining him to the SHU was insufficiently detailed and that he was not given an opportunity to challenge it, and that the psychological reviews performed on him were inadequate.

Plaintiff disputes that the Segregation Review Officer conducted formal reviews with plaintiff on a consistent basis. He also disputes that the reviewing official informed him of his status as "High Security" and of the reason for his placement in the Special Housing Unit.

Paragraph B14.

"On April 25, 2002, plaintiff filed a Form BP-10 appeal of this determination, *see id.* at ¶ 22 & Ex. 22, which was denied on June 3, 2002, *see id.* at ¶ 22 & Ex. 23.  In the June 3 denial letter, the BOP Regional Director stated that "[a]n investigation into your appeal revealed that you received a detailed detention order upon placement in SHU at MDC Brooklyn.  Additionally, while you were housed in the SHU, you received formal SHU reviews and evaluations in compliance with policy. You have presented no evidence that the SHU reviews were forged documents." *Id.* at Ex. 23.  On June 11, 2002, plaintiff appealed to the BOP central office, *see id.* at ¶ 23 & Ex. 24, which was denied on August 8, 2002, *see id.* at ¶ 23 & Ex. 25."

Plaintiff does not dispute that he filed an appeal on April 25, 2002.  Plaintiff also does not dispute that the Regional Director subsequently denied his appeal, but does not know and therefore disputes the date on which it was denied.  Plaintiff does not dispute that the Regional Director's denial included the statement that "[a]n investigation into your appeal revealed that you received a detailed detention order upon placement in SHU at MDC Brooklyn.  Additionally, while you were housed in the SHU, you received formal SHU reviews and evaluations in compliance with policy.  You have presented no evidence that the SHU reviews were forged documents."

Plaintiff does, however, dispute those allegations.  Specifically, plaintiff disputes that he received a detailed detention order upon placement in SHU at MDC Brooklyn.  Plaintiff also he received formal SHU reviews and evaluations in compliance with policy while he was confined in SHU. Plaintiff also disputes the claim that he had presented no evidence that the SHU reviews were forged and rather alleges that his statements in his administrative remedy request and appeal constituted evidence of this fact.  Plaintiff further alleges that he could not point out the obvious forgeries in those documents, which plaintiff will address in later paragraphs of this submission, since he was not given copies of those documents until he received the exhibits attached to the Colvin declarations which the defendants filed in this proceeding.  Plaintiff does not dispute that he appealed that denial to the BOP's Central Office on June 11, 2002.  Plaintiff does not know and therefore

disputes the date of that denial.  Plaintiff also disputes any suggestion that the denial was served on him on or about August 8, 2002.

Paragraph B15

"On February 13, 2002, plaintiff submitted a Form BP-8 Inmate Request for Informal Resolution, which was denied.  *See id.* at ¶ 24 n.5 & Exs. 26-27.  On February 24, 2002, plaintiff filed a formal remedy request, which related to the psychiatric evaluations plaintiff had received from MDC psychologist, Dr. Parry Hess, in connection with his SHU incarceration: plaintiff alleged that the psychologist's evaluations did not conform with the requirements of 28 C.F.R. § 541.22 in that they were insufficiently thorough and did not include all relevant factors, and he claimed that a more detailed evaluation would demonstrate that he should be released from the MDC SHU.[1]  *See* Colvin 2012 Dec. ¶ 24 & Ex. 28.  On March 13, 2002, this request was denied.  *Id.* at ¶ 24 & Ex. 29."

Plaintiff does not dispute that he filed a BP-8 on February 13, 2002 and that that request was subsequently denied.  Plaintiff further alleges that in that BP-8, he stated that his request concerned "psychiatric/psychological assessment pursuant to C.F.R. Sec. 541.22".  Plaintiff then stated "I informed Dr. Hess of the requirements of C.F.R. Sec. 541.22.  Dr. Hess ignored his responsibilities and just asked a few basic questions about my sleep, about hurting myself, and my eating habits.  Dr. Hess stated that it is not his job to assess or address the danger that I may pose to staff or inmates and my adjustment to SHU in order to assist the Segregation Review Official (S.R.O.) In deciding my continued need for S.H.U. confinement during the required Special Housing Review Hearings.  Dr. Hess stated that he merely fills out a form, checks off some boxes and makes a short statement/summary.  Dr. Hess has clearly demonstrated a poor command of the role he has pursuant to C.F.R. Sec. 541.22 and is creating assessments in a "cookie-cutter" or "production line fashion."  ACTION REQUESTED; 1) All mental health staff (including Dr.

---

[1] Plaintiff dropped Dr. Hess as a defendant when he filed his amended complaint on January 16, 2013 (*See* Docket Entry #101).

Hess) properly perform their duties pursuant to C.F.R. Sec. 541.22 and conduct proper assessments."appeal on April 25, 2002.  Plaintiff also does not dispute that the Regional Director subsequently denied his appeal, but does not know and therefore disputes the date on which it was denied.

Plaintiff does not dispute the remainder of this allegation.

Paragraph B15, footnote 4.

"Plaintiff dropped Dr. Hess as a defendant when he filed his amended complaint on January 16, 2013 (*See* Docket Entry #101)"

Plaintiff does not dispute this allegation.

Paragraph B16.

"On March 19, 2002, plaintiff appealed the denial of his formal remedy to the BOP regional office, *see id.* at ¶ 25 & Ex. 30, and this appeal was rejected by that office on April 19, 2002, *see id.* at ¶ 25 & Ex. 31.  In the April 19 determination, the BOP Regional Director stated that "[a]n investigation into your appeal revealed that psychological assessments at MDC Brooklyn are conducted in compliance with policy. . . . According to policy, the 30-day SHU evaluation is not used to make a determination about your release from the SHU."  *Id.* at 31.  Plaintiff appealed to BOP's central office on April 28, 2002, *see id.* at ¶ 26 & Ex. 32, and on June 20, 2002, the central office denied plaintiff's appeal, *see id.* at ¶ 26 & Ex. 33."

Plaintiff does not dispute that he filed an appeal on March 19, 2002, but does dispute that it was from a "formal remedy" and alleges rather that it was from his administrative remedy request.  He also does not dispute that the Regional Director subsequently denied his appeal, but does not know and therefore disputes the date on which it was denied.  He does not dispute that the Regional Director's denial included the phrases that "[a]n investigation into your appeal revealed that psychological assessments at MDC Brooklyn are conducted in compliance with policy" and that "[a]ccording to policy, the 30-day SHU evaluation is not used to make a determination about your release from the SHU."

Plaintiff does, however, dispute those allegations.  Specifically, he disputes that "psychological assessments at MDC Brooklyn are conducted in compliance with policy" and that "[a]ccording to policy, the 30-day SHU evaluation is not used to make a determination about your release from the SHU."   Plaintiff does not dispute that he appealed that denial to the BOP's Central Office on April 28, 2002.  Plaintiff does not know and therefore disputes the date of that denial. Plaintiff also disputes the factual allegations contained in those denials.  Plaintiff also disputes any suggestion that the denial was served on him on or about June 20, 2002.

Paragraph C, footnote 5.

"BOP reviews also were conducted during plaintiff's MCC-SHU detention.  Given the Southern District of New York's dismissal of plaintiff's MCC claims, the Federal Defendants only have included along with the Colvin 2013 Declaration a record of the reviews done at MDC but can supplement the record should the Court find that plaintiff's MCC claims are not barred by the applicable statute of limitations.  Colvin 2013 Dec. at Section B, n. 2."

Plaintiff disputes these allegations.  Specifically, he disputes that BOP reviews were conducted during his MCC-SHU confinement.  He also disputes that the Southern District of New York dismissed plaintiff's claims, and instead alleges that the Southern District only dismissed the MCC claims as to MCC defendants other than defendant Hasty. The defendants' refusal to disclose the alleged MCC reviews is simply another instance of the defendants' refusal to provide plaintiff with the discovery to which he is entitled under clearly established federal caselaw in order adequately to rebut the defendants' factual claims in support of their dismissal and summary judgment motions.  Memorandum in Support of Plaintiff's Motion to Compel Discovery, filed on 2/15/2 at p. 17; see also Plaintiff's letter of discovery requests to the defendants dated January 21, 2013, which is attached to plaintiff's letter (later deemed memorandum) to your Honor dated February 20,

2013).

Paragraph C17.

"On July 27, 2001, the SHU review forms reflect that the Bureau of Prisons ("BOP"), by and through Lieutenant Barrere, conducted a record review of plaintiff's placement in administrative detention in the MDC SHU.  Colvin 2013 Dec. at ¶ 9, Ex. E.  Lieutenant Barrere continued plaintiff's housing in SHU.  *Id.*"

Plaintiff does not dispute that Part I of the referenced BOP form claims that defendant Barrere conducted a "3 day" review of undescribed nature concerning plaintiff's confinement in SHU on July 27, 2001.  It does not indicate that this was a "record" review as defendants now allege.  Moreover, although the signature at the bottom of this section of the form appears to begin "S. B" the remainder of the signature is illegible and the only printed name next to the signature is "Captain S. Lopresti."  Moreover, the signature is followed by a completely illegible notation which may be intended to indicate that the signature was written by someone other than the person whose signature it purports to be. Plaintiff also disputes the claim that Lieutenant Barrere, Captain Lopresti or anyone else conducted any such review.  Plaintiff also alleges that Section II of said form, which is entitled "Record Review" and provides spaces to be filled in the the officer conducting the record review as to the "date," "action taken," "Remarks" and "Signature" is entirely blank, thus indicating that no record review was conducted.  Plaintiff also alleges that Colvin was not present at MDC during any part of the period of his confinement in MDC SHU and that despite the fact that Barrara is a defendant in this case, the defendants have failed to provide an affidavit from him confirming either his signature or the claims (and lack of claims) made in Sections I and II of this document.

Paragraph C18.

"On July 31, 2001, the SHU review forms reflect that plaintiff appeared before Lieutenant Barrere for a formal review of plaintiff's status in administrative detention. Lieutenant Barrere continued plaintiff's housing in SHU and noted plaintiff's status as "high security." *Id."*

Plaintiff does not dispute that Section III of the referenced BOP form claims that a "7 day" review of plaintiff's confinement in SHU was conducted on July 31, 2001. He does, however, dispute the claim that Lieutenant Barrere or anyone else conducted any such review. To the contrary, the space where the name of the SRO officer is supposed to be listed is blank (section III, line 1 of the form). Plaintiff does not dispute that the report indicates that the inmate appeared for that purported review.

Plaintiff does dispute, however, that he appeared, or was even asked or permitted to appear, for any such review. Plaintiff also disputes all of the factual allegations contained in that document, including the claim that plaintiff was seen daily by medical staff, the claim that he was provided with prescribed weekly exercise, the claim that he was seen daily by a designated representative of the warden and the claim that proper documentation and justification was contained in the Central File.

Plaintiff also disputes that defendant Lopresti conducted any review, although his name is printed in the space for the name of the "Reviewing Authority" (section III, line 1 of the form) and also printed at the bottom of the form as one of the reviewing officers. The fact that Lopresti's name is printed on the form in the same handwriting as the previous sections of the report which the defendants claim were prepared by defendant Barrere, but not signed by him as that signature appears on other of the defendants' exhibits (see eg. Colvin 2013 Decl., exh. F) establishes that defendant Lopresti did not sign this form, as he was required to do on the last line and that the form therefore lacks any confirmation that he conducted the review required of the Reviewing Authority by BOP Regulations and the

form itself.  Plaintiff also alleges that Colvin was not present at MDC during any part of the period of his confinement in MDC SHU and that despite the fact that LoPresti and Barrere are defendants in this case, the defendants have failed to provide an affidavit from either one of them confirming either their signature or the claims made in this document.

Paragraph C19.
"On August 7, 2001, the SHU review forms reflect that Lieutenant Barrere conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Barrere continued plaintiff's housing in SHU. Id. at ¶ 11, Ex. F."
Paragraph C20.
"On August 14, 2001, the SHU review forms reflect that Lieutenant Barrere conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Barrere continued plaintiff's housing in SHU. Id. at ¶ 12, Ex. F."
Paragraph C21.
"On August 21, 2001, the SHU review forms reflect that Lieutenant Barrere conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Barrere continued plaintiff's housing in SHU. Id. at ¶ 13, Ex. F."

Plaintiff does not dispute that Section II of the form referenced in defendants' paragraphs 19, 20 and 21 indicates that record reviews were conducted on August 7,14 and 21, 2001 and that plaintiff was confined to SHU during and after those dates.  Plaintiff does dispute that any such record reviews were in fact conducted.  Plaintiff also disputes whether defendant Barrere is the person who claims to have conducted such reviews, since his name nowhere appear on the referenced form, and the signature next to this entry is illegible.  Plaintiff further alleges that all three of the entries claiming that record reviews were conducted - dated August 7, 2001, August 14, 2001 and August 21, 2001 - as well as the Section III entries which were supposedly made by defendant Lopresti were instead made by the same person and at the same time, as indicated by the identical nature of the handwriting for all of the entries.  Given that fact and the parallel lineation of the three entries regarding alleged record reviews, it is clear that these entries were not made on the dates indicated.

Paragraph C22.

"On August 23, 2001, after conducting a psychological review of plaintiff, MDC Psychologist Parry Hess prepared a written assessment for the Segregation Review Officer ("SRO"). Plaintiff refused to be interviewed by Dr. Hess.  In his written assessment of plaintiff, Dr. Hess noted that a precise prediction of dangerousness is difficult and should be modified over time as individual circumstances change; Dr. Hess wrote that plaintiff's current potential for harm to others was judged to be "moderate."  Id. at ¶ 14, Ex. H."

Plaintiff does not dispute that a SHU psychological review form which was purported to have been prepared by former defendant Hess and dated August 23, 2001 did claim that on that date, former defendant Hess did claim that he had conducted a psychological review of plaintiff, that plaintiff had refused to be interviewed, that a precise prediction of dangerousness is difficult and should be modified over time as individual circumstances change and that plaintiff's current potential for harm to others was judged to be moderate.

Plaintiff disputes that Hess's review was sufficient to constitute a valid psychological review.  Plaintiff also disputes that he ever refused to interviewed by former defendant Hess or any other psychologist. Plaintiff alleges that all of the six SHU psychological assessment forms included in exhibit H which were done by psychologists other than former defendant Hess stated that plaintiff was interviewed. Plaintiff further alleges that the phrase about precise prediction of dangerousness is a stock phrase which appears verbatim on every SHU psychological review form (see all 8 of the psychological assessments set forth in Colvin 2013 decl. Exh. H).  Plaintiff disputes that his potential for harm to others was "moderate."  Plaintiff alleges that all of the six SHU psychological assessment forms included in exhibit H which were done by psychologists other than former defendant Hess rated plaintiff's current potential for harm to others was judged to be "low."  Plaintiff also alleges that the Hess report dated August 23, 2001 stated that

plaintiff's current mental; status, emotional expression, and behavior do not suggest significant mental health problems," that his "adjustment to the Special Housing Unit appears to be satisfactory" and that his risk of self-harm is judged to be LOW."

Paragraph C23.

"On August 24, 2001, the SHU review forms reflect that plaintiff appeared before Captain Lopresti for a formal review of plaintiff's status in administrative detention. Captain Lopresti continued plaintiff's housing in SHU and plaintiff received a written copy of staff's decision and the basis for the finding. Captain Lopresti noted plaintiff's status was "high security," that plaintiff was designated to USP Lewisberg and that he had a history of assault. Id. at ¶ 15, Ex. F."

Plaintiff does not dispute that Section III of the form referenced in defendants' paragraph 23 indicates that a "30 day" review was conducted on August 24, 2001, that plaintiff was confined to SHU during and after that date and that the report contains the remark " "high security," that plaintiff was designated to USP Lewisberg and that he had a history of assault."

Plaintiff does dispute that any such review was conducted and disputes that he appeared before defendant Lopresti or anyone else for such a review. Plaintiff also disputes whether defendant Lopresti is the person who claims to have conducted such reviews, since the handwriting on the report of that alleged review is the same as the handwriting in Section II of that same form, which the defendants allege was completed by defendant Barrere. Plaintiff further disputes that the form was signed by defendant Lopresti.

Paragraph C24.
"On August 28, 2001, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention. Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 16, Ex. F."
Paragraph C25.
"On September 4, 2001, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention. Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 17, Ex. F."

Paragraph C26.
"On September 11, 2001, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU.  Id. at ¶ 18, Ex. F."
Paragraph C27.
"On September 18, 2001, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 19, Ex. F."

Plaintiff does not dispute that Section II of the form referenced in defendants' paragraphs 24, 25, 26 and 27 indicates that record reviews were conducted on August 28 and September 4, 11 and 18, 2001 and that plaintiff was confined to SHU during and after those dates.

Plaintiff does dispute that any such record reviews were in fact conducted. Plaintiff further alleges that all four of the entries claiming that record reviews were conducted - dated August 24, 2001, September 4, 2001, September 11, 2001 and September 18, 2001 - as well as the Section III entries which were supposedly made by defendant Lopresti were instead made by the same person and at the same time, as indicated by the identical nature of the handwriting for all of the entries.  Given that fact and the parallel lineation of the three entries regarding alleged record reviews, it is clear that these entries were not made on the dates indicated.

Paragraph C28.

"On September 23, 2001, after conducting a psychological review of plaintiff, MDC Psychologist Florence Tam prepared a written assessment for the SRO.  In her written assessment of plaintiff, Dr. Tam noted that a precise prediction of dangerousness is difficult and should be modified over time as individual circumstances change; Dr. Tam wrote that plaintiff's current potential for harm to others was judged to be "low."  In addition, Dr. Tam noted that plaintiff's "mood was agitated because he did not think that he should be housed in SHU.  Furthermore, he believed that Psychology Services should interfere with his placement . . . This psychologist explained to this inmate that Psychology Services have no barrings [sic] on his housing status."  Id. at ¶ 20, Ex. H."

Plaintiff does not dispute these allegations.  Plaintiff also alleges that the

referenced report stated that plaintiff's current mental; status, emotional expression, and behavior do not suggest significant mental health problems," that his "adjustment to the Special Housing Unit appears to be satisfactory" and that his risk of self-harm is judged to be LOW." Plaintiff further alleges that the referenced report stated that during the interview, plaintiff "appeared calm and controlled with no signs of bizarre or disorganized behavior or psychomotor agitation," that he was "superficially cooperative and related appropriately with the interpreter," that "[b]esides the fact that he was angry with his current predicament, he reported no other significant adjustment problems," that he "reported normal appetite and sleep," that "no suicidal ideation was reported and none was suspected," and that "at present, Mr. Gonzalez appears psychiatrically stable and without significant adjustment problems."   Plaintiff further alleges that the phrase about precise prediction of dangerousness is a stock phrase which appears verbatim on every SHU psychological review form (see all 8 of the psychological assessments set forth in Colvin 2013 decl. Exh. H).

Paragraph C29.

"On September 24, 2001, the SHU review forms reflect that plaintiff appeared before Captain Lopresti for a formal review of plaintiff's status in administrative detention.  Captain Lopresti continued plaintiff's housing in SHU and plaintiff received a written copy of staff's decision and the basis for the finding.  The SHU review forms do not indicate a change in the "high security" reason for plaintiff's placement in SHU.  Id. at ¶ 21, Ex. F."

Plaintiff does not dispute that Section III of the form referenced in defendants' paragraph 29 indicates that a "30 day" review was conducted on September 24, 2001, that plaintiff was confined to SHU during and after that date and that the report contains the remark  "high security," and that plaintiff was designated to USP Lewisberg and that he had a history of assault."

Plaintiff does dispute that any such review was conducted and disputes that he appeared before defendant Lopresti or anyone else for such a review.  Plaintiff also disputes that he received a written copy of staff's decision and the basis for the finding.  Plaintiff also disputes whether defendant Lopresti is the person who claims to have conducted such reviews, since the handwriting on the report of that alleged review is the same as the handwriting in Section II of that same form, which the defendants allege was completed by defendant Barrere.  Plaintiff further disputes that the form was signed by defendant Lopresti.

Paragraph C30.
"On September 25, 2001, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 22, Ex. F."
Paragraph C31.
"On October 2, 2001, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 23, Ex. F."

Plaintiff does not dispute that Section II of the form referenced in defendants' paragraphs 30 and 31 indicates that record reviews were conducted on September 25 and October 2, 2001 and that plaintiff was confined to SHU during and after those dates.

Plaintiff does dispute that any such record reviews were in fact conducted.  Plaintiff further alleges that both of the entries claiming that record reviews were conducted - dated September 25, 2001, and October 2, 2001 - as well as the other two claims of record reviews supposedly made by defendant Ortiz in Section II and all of the Section III entries which were supposedly made by defendant Lopresti were instead made by the same person and at the same time, as indicated by the identical nature of the handwriting for all of the entries.  Given that fact and the parallel lineation of the three entries regarding alleged record reviews, it is clear that these entries were not made on the dates indicated.

Paragraph C32.

"On October 3, 2001, after conducting a psychological review of plaintiff, MDC Psychologist Florence Tam prepared a written assessment for the SRO.  In her written assessment of plaintiff, Dr. Tam noted that a precise prediction of dangerousness is difficult and should be modified over time as individual circumstances change; Dr. Tam wrote that plaintiff's current potential for harm to others was judged to be "low."  Dr. Tam also noted that she informed plaintiff that "Psychology Services do not have the authority to determine his housing status."  Id. at ¶ 24, Ex. H."

Plaintiff does not dispute these allegations.

Plaintiff also alleges that the referenced report stated that plaintiff's current mental; status, emotional expression, and behavior do not suggest significant mental health problems," that his "adjustment to the Special Housing Unit appears to be satisfactory" and that his risk of self-harm is judged to be LOW."  Plaintiff further alleges that the referenced report stated that during the interview, plaintiff "appeared calm and controlled with no signs of bizarre or disorganized behavior or psychomotor agitation," that he was "superficially cooperative and related appropriately with the interpreter," that "he was angry because he did not feel that he should be housed in SHU,"[b]esides his current angry mood, no significant adjustment problems were noted and none were observed," that he "reported normal appetite and sleep," that "no suicidal ideation was reported and none was suspected," and that "at present, Mr. Gonzalez appears psychiatrically stable and without significant adjustment problems."

Plaintiff further alleges that the phrase about precise prediction of dangerousness is a stock phrase which appears verbatim on every SHU psychological review form (see all 8 of the psychological assessments set forth in Colvin 2013 decl. Exh. H).

Paragraph C33.

"On October 9, 2001, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 25, Ex. F."

Paragraph C34.
"On October 16, 2001, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 26, Ex. F."

Paragraph C35.
"On October 23, 2001, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 27, Ex. F."

Plaintiff does not dispute that Section II of the forms referenced in defendants'

paragraphs 30 and 31 indicates that record reviews were conducted on October 9, 16 and

23, 2001 and that plaintiff was confined to SHU during and after those dates.

Plaintiff does dispute that any such record reviews were in fact conducted.

Plaintiff further alleges that all of the entries on the referenced forms claiming that record

reviews were conducted on those three dates as well as the other claims of record reviews

supposedly made by defendant Ortiz in Section II of those forms and all of the Section III

entries which were supposedly made by defendant Lopresti on those forms were instead

made by the same person and at the same time, as indicated by the identical nature of the

handwriting for all of the entries.  Given that fact and the parallel lineation of the three

entries regarding alleged record reviews, it is clear that these entries were not made on the

dates indicated.

Paragraph C36.

"On October 24, 2001, the SHU review forms reflect that plaintiff appeared before Captain Lopresti for a formal review of plaintiff's status in administrative detention.  Captain Lopresti continued plaintiff's housing in SHU and plaintiff received a written copy of staff's decision and the basis for the finding.  The SHU review forms do not indicate a change in the "high security" reason for plaintiff's placement in SHU.  Id. at ¶ 28, Ex. F."

Plaintiff does not dispute that Section III of the form referenced in defendants'

paragraph 36 claims that a "30 day" review was conducted on October 24, 2001, that plaintiff was confined to SHU during and after that date, and that "plaintiff received a written copy of staff's decision and the basis for the finding."

Plaintiff does dispute that any such review was conducted and disputes that he appeared before defendant Lopresti or anyone else for such a review.  Plaintiff also disputes that he received a written copy of staff's decision and the basis for the finding. Plaintiff also disputes whether defendant Lopresti is the person who claims to have conducted such reviews, since the handwriting on the report of that alleged review is the same as the handwriting in Section II of that same form, which the defendants allege was completed by defendant Ortiz.  Plaintiff further disputes that the form was signed by defendant Lopresti.

Paragraph C37.

"On October 30, 2001, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 29, Ex. F."

Plaintiff does not dispute that Section II of the form referenced in defendants' paragraphs 37 indicates that a record review was conducted on October 30, 2001 and that plaintiff was confined to SHU during and after those dates.

Plaintiff does dispute that any such a record review was in fact conducted. Plaintiff further alleges that all of the entries on the referenced forms claiming that record reviews were conducted on those three dates as well as the other claims of record reviews supposedly made by defendant Ortiz in Section II of those forms and all of the Section III entries which were supposedly made by defendant Lopresti on those forms were instead made by the same person and at the same time, as indicated by the identical nature of the

handwriting for all of the entries.  Given that fact and the parallel lineation of the three entries regarding alleged record reviews, it is clear that these entries were not made on the dates indicated.

Paragraph C38.

"On October 31, 2001, after conducting a psychological review of plaintiff, MDC Psychologist Florence Tam prepared a written assessment for the SRO.  In her written assessment of plaintiff, Dr. Tam noted that a precise prediction of dangerousness is difficult and should be modified over time as individual circumstances change; Dr. Tam wrote that plaintiff's current potential for harm to others was judged to be "low."  Id. at ¶ 30, Ex. H."

Plaintiff does not dispute these allegations.

Plaintiff also alleges that the referenced report stated that plaintiff's current mental; status, emotional expression, and behavior do not suggest significant mental health problems," that his "adjustment to the Special Housing Unit appears to be satisfactory" and that his risk of self-harm is judged to be LOW."  Plaintiff further alleges that the referenced report stated that during the interview, plaintiff "appeared calm and controlled with no signs of bizarre or disorganized behavior or psychomotor agitation," that he was "cooperative and related appropriately with the interpreter," that his "mental status appeared stable and unremarkable," no significant adjustment difficulties were reported and none were observed," that he "reported normal appetite and sleep," that "no suicidal ideation was reported and none was suspected," and that "at present, Mr. Gonzalez appears psychiatrically stable and without significant adjustment problems."

Plaintiff further alleges that the phrase about precise prediction of dangerousness is a stock phrase which appears verbatim on every SHU psychological review form (see all 8 of the psychological assessments set forth in Colvin 2013 decl. Exh. H).

Paragraph C39.
"On November 6, 2001, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 31, Ex. F."
Paragraph C40.
"On November 13, 2001, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 32, Ex. F."
Paragraph C41.
"On November 20, 2001, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 33, Ex. F."

Plaintiff does not dispute that Section II of the forms referenced in defendants' paragraphs 39, 40 and 41 indicates that record reviews were conducted on November 6, 13 and 20, 2001 and that plaintiff was confined to SHU during and after those dates.

Plaintiff does dispute that any such record reviews were in fact conducted. Plaintiff further alleges that all of the entries on the referenced forms claiming that record reviews were conducted on those three dates as well as the other claims of record reviews supposedly made by defendant Ortiz in Section II of those forms and all of the Section III entries which were supposedly made by defendant Lopresti on those forms were instead made by the same person and at the same time, as indicated by the identical nature of the handwriting for all of the entries.  Given that fact and the parallel lineation of the three entries regarding alleged record reviews, it is clear that these entries were not made on the dates indicated.

Paragraph C42.

"On November 21, 2001, after conducting a psychological review of plaintiff, MDC Psychologist Lorie Nicholas prepared a written assessment for the SRO.  In her written assessment of plaintiff, Dr. Nicholas noted that a precise prediction of dangerousness is difficult and should be modified over time as individual circumstances change; Dr. Nicholas wrote that plaintiff's current potential for harm to others was judged to be "low."  Id. at ¶ 34, Ex. H."

Plaintiff does not dispute these allegations.

Plaintiff also alleges that the referenced report stated that plaintiff's current mental; status, emotional expression, and behavior do not suggest significant mental health problems," that his "adjustment to the Special Housing Unit appears to be satisfactory" and that his risk of self-harm is judged to be LOW."  Plaintiff further alleges that the referenced report stated that during the interview, plaintiff "appeared calm and controlled with no signs of bizarre or disorganized behavior or psychomotor agitation," that he was "cooperative and related appropriately with the interpreter," that his "mental status appeared stable and unremarkable," no significant adjustment difficulties were reported and none were observed," that he "reported normal appetite and sleep," that "no suicidal ideation was reported and none was suspected," and that "at present, Mr. Gonzalez appears psychiatrically stable and without significant adjustment problems."

Plaintiff further alleges that the phrase about precise prediction of dangerousness is a stock phrase which appears verbatim on every SHU psychological review form (see all 8 of the psychological assessments set forth in Colvin 2013 decl. Exh. H).

Paragraph C43.

"On November 23, 2001, the SHU review forms reflect that plaintiff appeared before Captain Lopresti for a formal review of plaintiff's status in administrative detention.  Captain Lopresti continued plaintiff's housing in SHU and plaintiff received a written copy of staff's decision and the basis for the finding.  The SHU review forms do not indicate a change in the "high security" reason for plaintiff's placement in SHU.  Id. at ¶ 35, Ex. F."

Plaintiff does not dispute that Section III of the form referenced in defendants' paragraph 43 claims that a "30 day" review was conducted on November 23, 2001, that plaintiff was confined to SHU during and after that date, and that "plaintiff received a written copy of staff's decision and the basis for the finding."

Plaintiff does dispute that any such review was conducted and disputes that he appeared before defendant Lopresti or anyone else for such a review.  Plaintiff also disputes that he received a written copy of staff's decision and the basis for the finding.  Plaintiff also disputes whether defendant Lopresti is the person who claims to have conducted such reviews, since the handwriting on the report of that alleged review is the same as the handwriting in Section II of that same form, which the defendants allege was completed by defendant Ortiz.  Plaintiff further disputes that the form was signed by defendant Lopresti.

Paragraph C44.
"On November 27, 2001, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 36, Ex. F."
Paragraph C45.
"On December 4, 2001, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 37, Ex. F."
Paragraph C46.
"On December 11, 2001, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 38, Ex. F."
Paragraph C47.
"On December 18, 2001, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 39, Ex. F."

Plaintiff does not dispute that Section II of the forms referenced in defendants' paragraphs 40 - 47   indicates that record reviews were conducted on November 27, December 4, 11 and 18, 2001 and that plaintiff was confined to SHU during and after those dates.

Plaintiff does dispute that any such record reviews were in fact conducted.  Plaintiff further alleges that all of the entries on the referenced forms claiming that record reviews were conducted on those three dates as well as the other claims of record reviews

supposedly made by defendant Ortiz in Section II of those forms and all of the Section III

entries which were supposedly made by defendant Lopresti on those forms were instead

made by the same person and at the same time, as indicated by the identical nature of the

handwriting for all of the entries.   Given that fact and the parallel lineation of the three

entries regarding alleged record reviews, it is clear that these entries were not made on the

dates indicated.

Paragraph C48.

"On December 21, 2001, MDC Psychologist Emily Streeter prepared a written assessment for the
SRO after conducting a psychological review of plaintiff.  In her written assessment of plaintiff, Dr.
Streeter noted that a precise prediction of dangerousness is difficult and should be modified over time
as individual circumstances change; Dr. Streeter wrote that plaintiff's current potential for harm to
others was judged to be "low."  Id. at ¶ 40, Ex. H."

        Plaintiff does not dispute these allegations.

        Plaintiff also alleges that the referenced report stated that plaintiff's current

mental; status, emotional expression, and behavior do not suggest significant mental health

problems," that his "adjustment to the Special Housing Unit appears to be satisfactory" and

that his risk of self-harm is judged to be LOW."  Plaintiff further alleges that the referenced

report stated that during the interview, plaintiff "appeared calm and controlled with no signs

of bizarre or disorganized behavior or psychomotor agitation," that he was "cooperative and

related appropriately with the interpreter," that his "mental status appeared stable and

unremarkable," that "Mr. Gonzalez denied experiencing psychological distress and reported

no disturbance of eating or sleeping patterns," that "no adjustment difficulties were reported

and none were observed," that "no suicidal ideation was reported and none was

suspected," and that "[P]resently, Mr. Gonzalez appears psychiatrically stable and without

significant adjustment problems."

Plaintiff further alleges that the phrase about precise prediction of dangerousness is a stock phrase which appears verbatim on every SHU psychological review form (see all 8 of the psychological assessments set forth in Colvin 2013 decl. Exh. H).

Paragraph C49.

"On December 23, 2001, the SHU review forms reflect that plaintiff appeared before Captain Lopresti for a formal review of plaintiff's status in administrative detention.  Captain Lopresti continued plaintiff's housing in SHU and plaintiff received a written copy of staff's decision and the basis for the finding.  The SHU review forms do not indicate a change in the "high security" reason for plaintiff's placement in SHU.  Id. at ¶ 41, Ex. F."

Plaintiff does not dispute that Section III of the form referenced in defendants' paragraph 43 claims that a "30 day" review was conducted on December 23, 2001, that plaintiff was confined to SHU during and after that date, and that "plaintiff received a written copy of staff's decision and the basis for the finding."

Plaintiff does dispute that any such review was conducted and disputes that he appeared before defendant Lopresti or anyone else for such a review.  Plaintiff also disputes that he received a written copy of staff's decision and the basis for the finding. Plaintiff also disputes whether defendant Lopresti is the person who claims to have conducted such reviews, since the handwriting on the report of that alleged review is the same as the handwriting in Section II of that same form, which the defendants allege was completed by defendant Ortiz.  Plaintiff further disputes that the form was signed by defendant Lopresti.

Paragraph C50.
"On December 25, 2001, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 42, Ex. F."
Paragraph C51.
"On January 1, 2002, the SHU review forms reflect that Lieutenant Ortiz conducted a record review

of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 43, Ex. F."
Paragraph C52.
"On January 8, 2002, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 44, Ex. F."
Paragraph C53.
"On January 15, 2002, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 45, Ex. F."

Plaintiff does not dispute that Section II of the forms referenced in defendants' paragraphs 50-53  indicates that record reviews were conducted on December 25, 2001 and January 1, 8 and 15, 2002 and that plaintiff was confined to SHU during and after those dates.

Plaintiff does dispute that any such record reviews were in fact conducted. Plaintiff further alleges that all of the entries on the referenced forms claiming that record reviews were conducted on those four dates as well as the other claims of record reviews supposedly made by defendant Ortiz in Section II of those forms and all of the Section III entries which were supposedly made by defendant Lopresti on those forms were instead made by the same person and at the same time, as indicated by the identical nature of the handwriting for all of the entries.  Given that fact and the parallel lineation of the three entries regarding alleged record reviews, it is clear that these entries were not made on the dates indicated.

Paragraph C54.

"On January 18, 2002, MDC Psychologist Lisa Hope prepared a written assessment to the SRO after conducting a psychological review of plaintiff.  In her written assessment of plaintiff, Dr. Hope noted that a precise prediction of dangerousness is difficult and should be modified over time as individual circumstances change; Dr. Hope wrote that plaintiff's current potential for harm to others was judged to be "low."  Id. at ¶ 46, Ex. H."

Plaintiff does not dispute these allegations.

Plaintiff also alleges that the referenced report stated that plaintiff's current mental status, emotional expression, and behavior do not suggest significant mental health problems," that his "adjustment to the Special Housing Unit appears to be satisfactory" and that his "risk of self-harm is judged to be LOW."  Plaintiff further alleges that the referenced report stated that during the interview, plaintiff "was cooperative and answered all presented questions," that he "denied experiencing difficulties related to his adjustment in SHU", that his hygiene and cell sanitation appeared adequate," that he reported regular eating and sleeping habits," that his mood was euthymic and his thoughts were clear and goal-oriented," that he maintained eye contact and his behavior was appropriate, that he did not appear to be experiencing significant distress and he denied current suicidal or homicidal ideation or intention."

Plaintiff further alleges that the phrase about precise prediction of dangerousness is a stock phrase which appears verbatim on every SHU psychological review form (see all 8 of the psychological assessments set forth in Colvin 2013 decl. Exh. H).

Paragraph C55.

"On January 22, 2002, the SHU review forms reflect that plaintiff appeared before Captain Lopresti for a formal review of plaintiff's status in administrative detention.  Captain Lopresti continued plaintiff's housing in SHU and plaintiff received a written copy of staff's decision and the basis for the finding.  The SHU review forms do not indicate a change in the "high security" reason for plaintiff's placement in SHU.  Id. at ¶ 47, Ex. F."

Plaintiff does not dispute that Section III of the form referenced in defendants' paragraph 43 claims that a "30 day" review was conducted on December 23, 2001, that plaintiff was confined to SHU during and after that date, and that "plaintiff received a written copy of staff's decision and the basis for the finding."

Plaintiff does dispute that any such review was conducted and disputes that he appeared before defendant Lopresti or anyone else for such a review.  Plaintiff also disputes that he received a written copy of staff's decision and the basis for the finding.  Plaintiff also disputes whether defendant Lopresti is the person who claims to have conducted such reviews, since the handwriting on the report of that alleged review is the same as the handwriting in Section II of that same form, which the defendants allege was completed by defendant Ortiz.  Plaintiff further disputes that the form was signed by defendant Lopresti.

Paragraph C56.
"On January 22, 2002, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 48, Ex. F."
Paragraph C57.
"On January 29, 2002, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 49, Ex. F."
Paragraph C58.
"On February 5, 2002, the SHU review forms reflect that Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention.  Lieutenant Ortiz continued plaintiff's housing in SHU. Id. at ¶ 50, Ex. F."

Plaintiff does not dispute that Section II of the forms referenced in defendants' paragraphs 56-58 indicates that record reviews were conducted on January 22 and 29, 2002 February 25, 2002 and that plaintiff was confined to SHU during and after those dates.

Plaintiff does dispute that any such record reviews were in fact conducted.  Plaintiff further alleges that all of the entries on the referenced forms claiming that record reviews were conducted on those four dates as well as the other claims of record reviews supposedly made by defendant Ortiz in Section II of those forms and all of the Section III entries which were supposedly made by defendant Lopresti on those forms were instead

made by the same person and at the same time, as indicated by the identical nature of the handwriting for all of the entries.   Given that fact and the parallel lineation of the three entries regarding alleged record reviews, it is clear that these entries were not made on the dates indicated.

Paragraph C59.

"On February 13, 2002, MDC Psychologist Parry Hess prepared a written assessment for the SRO after conducting a psychological review of plaintiff.  In his written assessment of plaintiff, he noted that a precise prediction of dangerousness is difficult and should be modified over time as individual circumstances change; Dr. Hess determined that plaintiff's current potential for harm to others had increased and was judged to be "moderate."  In addition, Dr. Hess noted that plaintiff's "history of violent crime, his repeated aggressive behavior in jail, his current labile mood, and his expression of interpersonal distrust suggest a moderate to high risk of future assaultive behavior.  However, it should be noted that the immediate risk of violence is much lower, given his restrictive housing assignment and given no signs of current violent plans or thoughts."  Id. at ¶ 51, Ex. H."

Plaintiff does not dispute that Exhibit H is a SHU psychological review form which was purported to have been prepared by former defendant Hess and dated February 13, 2002 did claim that on that date, former defendant Hess did claim that he had conducted a psychological review of plaintiff, that a precise prediction of dangerousness is difficult and should be modified over time as individual circumstances change and that plaintiff's current potential for harm to others was judged to be moderate.

Plaintiff disputes that the report anywhere states that former defendant Hess "determined that plaintiff's current potential for harm to others had increased." Plaintiff also disputes that his potential for harm to others was "moderate" or that he had a moderate to high risk of future assaultive behavior.  Plaintiff alleges that all of the six SHU psychological assessment forms included in exhibit H which were done by psychologists other than former defendant Hess rated plaintiff's current potential for harm to others was judged to be "low."

Plaintiff also alleges that the Hess report dated February 13, 2001 stated that plaintiff's current mental; status, emotional expression, and behavior do not suggest significant mental health problems," that his "adjustment to the Special Housing Unit appears to be satisfactory" and that his risk of self-harm is judged to be LOW."

Plaintiff further alleges that the phrase about precise prediction of dangerousness is a stock phrase which appears verbatim on every SHU psychological review form (see all 8 of the psychological assessments set forth in Colvin 2013 decl. Exh. H).

Paragraph C60.

"On February 21, 2002, the SHU review forms reflect that plaintiff appeared before Captain Lopresti for a formal review of plaintiff's status in administrative detention.  Captain Lopresti continued plaintiff's housing in SHU and plaintiff received a written copy of staff's decision and the basis for the finding.  The SHU Review forms do not indicate a change in the "high security" reason for the reason for plaintiff's placement in SHU.  Id. at ¶ 52, Ex. F."

Plaintiff does not dispute that Section III of the form referenced in defendants' paragraph 50 claims that a "30 day" review was conducted on February 21, 2002, that plaintiff was confined to SHU during and after that date, and that "plaintiff received a written copy of staff's decision and the basis for the finding."

Plaintiff does dispute that any such review was conducted and disputes that he appeared before defendant Lopresti or anyone else for such a review.  Plaintiff also disputes that he received a written copy of staff's decision and the basis for the finding. Plaintiff also disputes whether defendant Lopresti is the person who claims to have conducted such reviews, since the handwriting on the report of that alleged review is the same as the handwriting in Section II of that same form, which the defendants allege was completed by defendant Ortiz.  Plaintiff further disputes that the form was signed by

defendant Lopresti.

Paragraph C61.

"Although BOP could not locate the "Special Housing Review" forms reflecting plaintiff's housing in SHU from February 22, 2002 through March 16, 2002, "Special Housing Unit Record" forms reflect that during this time, plaintiff was offered showers, meals and recreation on a regular basis. Additionally, the SHU Record forms reflect that medical department personnel made daily rounds in SHU.  Id. at ¶ 10, n. 3, Ex. G."

Plaintiff does not dispute that Exhibit G contains documents entitled Special

Housing Unit Records that purport to show the dates when plaintiff was allegedly provided

showers, meals recreation and visits by medical staff during a twenty-two day portion of the

291 days that he was confined to MDC SHU.  Plaintiff does not dispute that he was provided

meals on a daily basis.

Plaintiff disputes that he was provided showers and recreation on a regular

basis.   Plaintiff also disputes that he was visited on a daily basis by medical staff.

Paragraph C62.
"After plaintiff was transferred to USP-Lewisburg, the SHU review forms reflect that plaintiff appeared before a BOP official at USP-Lewisburg on March 24, 2012 for a formal review of plaintiff's status in administrative housing.  Plaintiff was kept in SHU.  Id. at ¶ 53, Ex. I."

Plaintiff does not dispute this allegation.

Paragraph C63.
"On March 31, 2002, the SHU review forms reflect that a record review of plaintiff's placement in administrative detention at USP-Lewisburg was conducted.  Plaintiff was kept in SHU.  Id. at 54, Ex. I."

Plaintiff does not dispute this allegation.

Paragraph C64.

"On April 7, 2002, the SHU review forms reflect that a record review of plaintiff's placement in administrative detention at USP-Lewisburg was conducted.  Plaintiff was kept in SHU.  Id."

Plaintiff does not dispute this allegation.

Paragraph C65.

"On April 11, 2002, after plaintiff returned to MDC, Lieutenant Wilkens issued an administrative detention order placing plaintiff in administration detention pending a captain's review.  Id. at ¶ 8, Ex. D."

Plaintiff does not dispute this allegation.

Paragraph D66.

"Warden Dennis Hasty served as the warden of MCC from July 6, 1997 until August 12, 2001, and as the warden of MDC from August 13, 2001 until April 1, 2002.  Colvin 2013 Dec. at ¶ 64; Colvin 2012 Dec. at ¶ 27; see also Gonzalez, 2012 WL 4473689 at *6."

Plaintiff does not dispute that defendant Hasty was the warden of MCC and subsequently the warden of MDC.  He disputes the dates during which he held those positions and alleges that Crista Colvin was not present at either MCC or MDC during the dates alleged by the defendants, and does not cite any source in support of these allegations.

Paragraph D67.

"Associate Warden James Sherman was the associate warden of MDC during at least part of the period of plaintiff's MDC-SHU detention; however, he was not at MCC during plaintiff's MCC-SHU detention.  Colvin 2013 Dec. at ¶ 65."

Plaintiff does not dispute these allegations.

Paragraph D68.

"Lieutenant Steven Barrere was a lieutenant at MDC during at least part of the period of plaintiff's MDC-SHU detention; however, he was not at MCC during plaintiff's MCC-SHU detention.  Id. at ¶ 66.

Plaintiff does not dispute these allegations.

Paragraph D69.

"Lieutenant Douglas White was a lieutenant at MDC during at least part of the period of plaintiff's MDC-SHU detention; however, he was not at MCC during plaintiff's MCC-SHU detention.  Id. at ¶ 67."

Plaintiff does not dispute these allegations.

Paragraph D70.

"Lieutenant Daniel Ortiz was a lieutenant at MDC during at least part of the period of plaintiff's MDC-SHU detention; however, he was not at MCC during plaintiff's MCC-SHU detention.  Id. at ¶ 68."

Plaintiff does not dispute these allegations.

PLAINTIFF'S SEPARATE STATEMENT OF ADDITIONAL
MATERIAL FACTS ALLEGED TO BE IN DISPUTE.

1.  Defendant LOPRESTI was indicted and convicted in the United States District Court for the Eastern District of New York for violating the rights of a prisoner in his custody at the Metropolitan Detention Center and other crimes.  United States v. Salvatore Lopresti, 07 Cr. 273 (CBA)(E.D.N.Y.); Department of Justice Press Release dated June 26, 2008, which is attached hereto as exhibit A.

2.  Defendant LOPRESTI participated in a conspiracy to use excessive force on an inmate at MDC, made false statement to federal agents, tampered with a witness and committed three separate acts of obstruction of justice.  United States v. Salvatore Lopresti, 07 Cr. 273 (CBA)(E.D.N.Y.);  Department of Justice Press Release dated June 26, 2008, which is attached hereto as exhibit A.

3.  Defendant LOPRESTI participated in two separate criminal schemes which he undertook in his official capacity at MDC.  United States v. Salvatore Lopresti, 07 Cr. 273 (CBA)(E.D.N.Y.);  Department of Justice Press Release dated June 26, 2008, which is attached hereto as exhibit A.

4.  Defendant LOPRESTI and four other MDC correctional officers, all of whom were under Lopresti's command, participated in a planned attack on a former MDC inmate and the subsequent cover-up. United States v. Salvatore Lopresti, 07 Cr. 273 (CBA)(E.D.N.Y.); Department of Justice Press Release dated June 26, 2008, which is attached hereto as exhibit A.

5.  The attack, led by Defendant LOPRESTI , was carried out in retaliation for the inmate's failure to follow Lopresti's direction to remove a t-shirt that was tying back the inmate's dreadlocks. United States v. Salvatore Lopresti, 07 Cr. 273 (CBA)(E.D.N.Y.);  Department of Justice Press Release dated June 26, 2008, which is attached hereto as exhibit A.

6.  During the attack, Defendant LOPRESTI punched the inmate in the face, and another officer slammed the inmate to the ground, leaving a pool of blood and clumps of the inmate's dreadlocks on the floor of the cell. United States v. Salvatore Lopresti, 07 Cr. 273 (CBA)(E.D.N.Y.);  Department of Justice Press Release dated June 26, 2008, which is attached hereto as exhibit A.

7.  After the attack, Defendant LOPRESTI tied the inmate's bedsheet into a noose and wrapped it around the bars of the cell's window in order to make it appear that the inmate had tried to hang himself. United States v. Salvatore Lopresti, 07 Cr. 273 (CBA)(E.D.N.Y.); Department of Justice Press Release dated June 26, 2008, which is attached hereto as exhibit A.

8.  Subsequently, Defendant LOPRESTI and the other officers covered up the beating by writing false reports claiming that the inmate had become combative as they attempted to save him from hanging himself, which prompted the officers' use of force against him.

United States v. Salvatore Lopresti, 07 Cr. 273 (CBA)(E.D.N.Y.);  Department of Justice Press Release dated June 26, 2008, which is attached hereto as exhibit A.

9.  All four of the other officers involved pled guilty to charges relating to their involvement in the beating and cover-up but Defendant LOPRESTI insisted on going to trial. United States v. Salvatore Lopresti, 07 Cr. 273 (CBA)(E.D.N.Y.);  Department of Justice Press Release dated June 26, 2008, which is attached hereto as exhibit A.

10.  One week after being convicted on the charges relating to the November 2002 inmate beating, Defendant LOPRESTI pled guilty to obstructing a separate federal grand jury investigation. United States v. Salvatore Lopresti, 07 Cr. 273 (CBA)(E.D.N.Y.); Department of Justice Press Release dated June 26, 2008, which is attached hereto as exhibit A..

11.  In April 2004, the Department of Justice, Office of the Inspector General ("DOJ/OIG") was investigating a memorandum that bore Defendant LOPRESTI'S signature and had been used by an MDC correctional officer in order to purchase and carry a concealed off-duty weapon, without obtaining a required firearms permit.

12.  During an interview with Special Agents of DOJ/OIG and an Assistant United States Attorney, Defendant LOPRESTI falsely denied writing any such memoranda, and added that he was prepared to testify as such before a federal grand jury that was considering charges against the correctional officer who had used the letter to obtain an off-duty weapon. United States v. Salvatore Lopresti, 07 Cr. 273 (CBA)(E.D.N.Y.); Department of Justice Press Release dated June 26, 2008, which is attached hereto as exhibit A..

13.  Federal agents subsequently uncovered eight of the memoranda on Lopresti's MDC computer and in various firearms stores in and around New York City.  United States v. Salvatore Lopresti, 07 Cr. 273 (CBA)(E.D.N.Y.; Department of Justice Press Release dated June 26, 2008, which is attached hereto as exhibit A..

14.  Handwriting analysis confirmed that Lopresti had in fact signed each memorandum. United States v. Salvatore Lopresti, 07 Cr. 273 (CBA)(E.D.N.Y.; Department of Justice Press Release dated June 26, 2008, which is attached hereto as exhibit A..

15.  Defendant LOPRESTI was sentenced to fifty-one months imprisonment and three years of supervised release. United States v. Salvatore LoPresti, 07 Cr. 273 (CBA)(E.D.N.Y.); Department of Justice Press Release dated June 26, 2008, which is attached hereto as exhibit A..

16.  Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE all have extensive records of complaints, reprimands, sanctions and legal actions for abuse of

inmates and other misconduct.

17.   Defendants ORTIZ and BARRERE have both been convicted administratively for assaulting inmates and making false statements.

18. Defendants have refused plaintiff's requests for discovery pertaining to the complaints, reprimands, sanctions and legal actions of the defendants.

19. Plaintiff Gonzalez was confined to SHU at MCC and MDC continuously from February 28, 1999 until May 11, 2002, with the exception of a 20 day period when he was confined to SHU in Lewisburg Federal Penitentiary.  This amounts to a total of 1163 days of continuous SHU confinement.

20.   Plaintiff Gonzalez was confined in MCC SHU and MDC SHU in violation of his constitutional rights.

21.   Conditions in the SHU in both MCC and MDC are extremely punitive.

22.   Inmates in the SHU are confined to their cells for 23 hours per day as opposed to six to seven hours per day for inmates in general population.

23.   Inmates in general population share the social interaction of eating meals, playing cards and other games and watching television with the other inmates in the housing unit.

24.   Inmates in general population can move around the prison facility, use the public phones, visit the law library and go to an open air exercise area with exercise equipment.

25.   BOP regulations in effect during the entire period of Plaintiff Gonzalez's SHU confinement required the Warden, if consistent with resources and security needs of the unit, to "give an inmate housed in administrative detention the same general privileges given to inmates in general population.  This includes, but is not limited to, providing an inmate with the opportunity for participation in an educational program, library services, social services, counseling, religious guidance and recreation." 28 C.F.R. § 541.22( c)(2001).

26.   Inmates confined to SHU are forced to eat in their cells with their meals delivered through a slot in the cell door.

27.   Inmates confined to SHU have almost no access to the telephone, and are sharply restricted as to showers, recreation, the law library and to the educational and rehabilitative programs which are available to the inmates in the general population.

28.   Exercise for inmates confined in the SHU normally consists of being taken to an small empty cell with no exercise equipment where the inmate is limited to pacing in a small circle.

29.  Inmates in SHU are handcuffed whenever they are removed from their cells

30.  Inmates in SHU are subjected to more frequent, degrading and unnecessary strip-searches than inmates in general population.

31.  For part of the time that Plaintiff Gonzalez was confined to SHU he was isolated in solitary cell.

32.  At other times, he was forced to share an isolation cell which was designed for one inmate with a second inmate.

33.  The cells in SHU are approximately 8 feet by 11 feet in size, have a bunk bed and an open toilet.

34.  No partition or curtain was available to provide any privacy for Plaintiff Gonzalez while using the toilet; rather, he was forced to urinate and defecate in full view of, and close proximity to, his cellmate.

35.  Prolonged confinement under such conditions has been established to have a severely detrimental effect on the mental and physical well-being of the individuals so confined, and had such an effect on Plaintiff Gonzalez.

36.  Plaintiff Gonzalez's prolonged confinement in SHU was psychological torture, depriving him of almost all of the opportunities for human contact, variation of daily routine, social, mental and sensory stimulation, exercise and other daily activities which are afforded to other inmates, and which are essential to individual well-being.

37.  Placing two adult men in a single isolation cell while at the same time restricting or prohibiting all other avenues for normal social interaction has well-studied and predictably detrimental effects.

38.  Double-celling, particularly in an isolation cell, has been shown to generate tension, stress, paranoia, anger and hostility between cellmates.

39.  Medical and psychological health concerns are addressed for inmates confined to SHU by having staff come to the cell door, thereby forcing the inmate to communicate his confidential concerns within earshot of staff and other prisoners, including his cellmate.

40.  Because of the extremely deleterious effects of SHU confinement, BOP regulations in effect during the entire period of Plaintiff Gonzalez's SHU confinement required that "[a]dministrative detention is to be used only for short periods of time except where an inmate needs long-term protection...or where there are exceptional circumstances."  28 C.F.R. § 541.22( c)(2001).

41.  The United Nations Special Rapporteur on Torture has found that using isolation as a punishment for more than 15 days amounts to torture and cruel, inhuman and degrading

treatment and has recommended that the use of this type of confinement in excess of 15 days be abolished in all cases.

42.  The United Nations General Assembly has called for an "absolute abolition" of this type of confinement.  Similarly, the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment recommends that isolation only be used as punishment in exceptional cases as a last resort, and for the shortest period of time possible, due to its potentially damaging effects.

43.  The recommendations of these and other experts and organizations reflect the overwhelming consensus that prisoner isolation should be used only sparingly, for short amounts of time and under tight controls.

44.  BOP regulations in effect during the entire period of Plaintiff Gonzalez's SHU confinement required that Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE give Plaintiff Gonzalez written notice detailing the reasons for his placement in SHU, ordinarily within 24 hours of such placement. 28 C.F.R. § 541.22(b)(2001),

45.  Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE failed to give Plaintiff Gonzalez such written notice.

46.  When Plaintiff Gonzalez was transferred to MDC Brooklyn on July 24, 2001, he was placed in Administrative Detention by Defendant WHITE without specific reason or explanation.

47.  This failure to give notice was done at the direction of defendants HASTY, SHERMAN, and LOPRESTI.

48.  Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE failed to give Plaintiff Gonzalez meaningful notice of the reasons for or nature of his SHU confinement.

49.  Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE failed to afford Plaintiff Gonzalez any opportunity to contest his confinement.

50.  Defendant LOPRESTI as captain of security at MDC never informed Plaintiff Gonzalez, or arranged for him to be informed by other prison personnel as to the results of the required "Captain's Review" if in fact such a review was ever conducted.

51.  This failure to give notice was done under orders from Defendant HASTY and with the full knowledge and assistance of Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE.

52.  BOP regulations in effect during the entire period of Plaintiff Gonzalez's SHU confinement required Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE to conduct three-day, seven-day and thirty-day reviews to determine whether

continued SHU confinement was required for Plaintiff Gonzalez 28 C.F.R. § 541.22(c)(2001).

53.  Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE and prison personnel under their supervision continuously failed to properly conduct and/or completely failed to conduct the required hearings and reviews throughout the period of Plaintiff Gonzalez's confinement in SHU.

54.  BOP regulations in effect during the entire period of Plaintiff Gonzalez's SHU confinement required Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE to allow Plaintiff Gonzalez to attend certain of these hearings.  28 C.F.R. § 541.22(c)(2001).

55.  Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE failed to allow Plaintiff Gonzalez to attend any such hearings.

56.  Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE and prison personnel under their supervision repeatedly filled out, reviewed and/or approved hearing forms to make it falsely appear that they were conducting the required SRO hearings and related procedures, when in fact they were not doing so.

57.  Defendants LOPRESTI, ORTIZ, BARRERE and other prison personnel repeatedly told Plaintiff Gonzalez that they did not have the authority to release him from SHU and that it was Defendant HASTY who was ordering that Plaintiff Gonzalez remain in SHU confinement.

58.  Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE and their agents were aware of this ongoing custom, policy and practice and refused to stop it or to report it to Defendant HASTY'S superiors.

59.  Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE and their agents instead held unauthorized weekly meetings to determine which inmates were to be released from SHU and returned to general population.

60.  Plaintiff Gonzalez was not allowed to attend these meetings or to comment on what was said by the participants.

61.  These actions by the defendants rendered any alleged SRO hearings a meaningless sham in violation of Plaintiff Gonzalez's constitutional rights.

62.  Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE discussed Plaintiff's SHU confinement on various occasions throughout the period of Plaintiff Gonzalez's confinement in SHU.

63.  Plaintiff Gonzalez was not provided with any written statement of evidence relied upon, or factual findings to support any claim of continued need for Plaintiff Gonzalez to be

subjected to SHU confinement.

64.  Plaintiff Gonzalez was not allowed any opportunity to be heard at a meaningful time and manner.

65.  Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE were each aware of and sanctioned these unlawful practices.

66.  Defendant HASTY continuously made it known to Defendants SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE and other prison personnel that he had a personal vendetta against Plaintiff Gonzalez, that he would not release Plaintiff Gonzalez from SHU under any circumstances and that Defendant HASTY and Plaintiff Gonzalez were to be "joined at the hip for a long time."

67.  Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE and other prison personnel agreed, confederated and conspired with Defendant HASTY throughout the period of Plaintiff Gonzalez's confinement in SHU to keep Plaintiff Gonzalez unlawfully confined to SHU under harsh conditions and to not report said unlawful confinement to Defendant HASTY's supervisors - the Regional and Central Office Directors or other responsible officials.

68.  Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE were each directly aware that Plaintiff Gonzalez had stated to Defendant HASTY that he (HASTY) was a racist and evil person who favored white inmates who held racist views and were involved in violence against minorities.

69.  Defendant HASTY kept Plaintiff Gonzalez confined under extremely punitive conditions in SHU at MCC and MDC in part as retaliation for Plaintiff Gonzalez having made these statements to him.

70.  Defendants SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE were aware that Defendant HASTY was retaliating against Plaintiff Gonzalez for this legally protected speech.

71.  Defendant HASTY had a confederate flag hanging in his office until a staff member filed a formal complaint and Defendant HASTY was ordered by the BOP to remove it.

72.  Defendants HASTY repeatedly ordered Defendants SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE and others to make Plaintiff's living conditions harsher than other similarly situated inmates by increasing and maintaining Plaintiff Gonzalez's isolation and denying him access to which he was entitled to outdoor recreation, sunlight, and fresh air, among other things.

73.  Defendants SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE were aware of Defendant HASTY's orders and continuously aided and abetted Defendant HASTY in effectuating those unlawful orders and practices.

74.  Defendant HASTY repeatedly directed Defendants SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE and other prison personnel not to provide Plaintiff Gonzalez with administrative and disciplinary hearings in order to obstruct, impede and deny Plaintiff Gonzalez's access to exculpatory evidence contained in the SIS investigation, the psychological assessments and elsewhere and thereby prevented Plaintiff Gonzalez from using that evidence to defend himself.

75.  Defendants SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE were aware of Defendant HASTY's unlawful scheme and plan.

76.  Defendants SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE condoned, sanctioned and ratified Defendant HASTY's illegal policies and practices toward Plaintiff Gonzalez

77.  Defendants SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE continuously took steps to implement and effectuate those illegal policies and practices.

78.  Defendants SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE  and other prison personnel were directly aware of, and aided and abetted Defendant HASTY's ongoing retaliation against Plaintiff Gonzalez.

79.  Defendants SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE were aware that Defendant Hasty had kept Plaintiff Gonzalez unlawfully confined in SHU at MCC.

80.  Defendants SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE were aware that Defendant HASTY was continuing to keep Plaintiff Gonzalez unlawfully confined in SHU at MDC under illegally harsh conditions, and aided and abetted him in doing so.

81.  Defendants SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE were aware that Defendant HASTY was continuing said illegal confinement without the required procedures - including but not limited to administrative and/or disciplinary hearings with meaningful notice to Plaintiff Gonzalez and an opportunity for him to be heard, copies of findings of fact and evidence upon which the findings relied, or a copy of the decision of the SRO in writing in order to enable Plaintiff Gonzalez to contest his continued need for SHU confinement.

82.  Defendants SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE repeatedly condoned, sanctioned, ratified and aided and abetted these unlawful actions and repeatedly failed to prevent these unlawful actions or to report them to Defendant HASTY's supervisors in the Regional or Central office.

83.  For part of Plaintiff Gonzalez's SHU confinement, Defendant HASTY directed and condoned Plaintiff Gonzalez's confinement in a separate section of the SHU called 10-South which was even more isolating and punitive than the regular SHU.

84.  Defendant HASTY did so in order to increase and continue his abuse and unlawful punishment of Plaintiff Gonzalez.

85.  BOP regulations in effect during the entire period of Plaintiff Gonzalez's SHU confinement required Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE and their agents to conduct monthly psychological assessments of Plaintiff Gonzalez, including a personal interview, for as long as he was confined to SHU, and to provide a written report to the SRO addressing Plaintiff Gonzalez's adjustment to surroundings and any threat which the inmate poses to himself, staff or other inmates. (28 C.F.R. § 541.22( c)(2001).

86.  Only eight psychological assessments were prepared concerning plaintiff Gonzalez during the more than ten months that he was confined to MDC SHU.  Colvin 2013 declaration at Exhibit H.

87.  Although six of the eight psychological assessments which were performed indicated that Plaintiff Gonzalez was not in need of further SHU confinement, Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE and their agents repeatedly ignored these reports and instead continued to confine Plaintiff Gonzalez in SHU without any of the required hearings or reviews.

88.  Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE did so in order to enable Defendant HASTY to continue to unlawfully abuse Plaintiff Gonzalez.

89.  Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE also repeatedly failed to make Plaintiff Gonzalez aware of these assessments and thereby prevented him from using these assessments to challenge his continued SHU confinement.

90.  BOP regulations in effect during the entire period of Plaintiff Gonzalez's SHU confinement required Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE and their agents to release Plaintiff Gonzalez from SHU confinement as soon as the reason for that confinement ceased to exist. 28 C.F.R. § 541.22( c)(2001).

91.  The refusal of Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE to release Plaintiff Gonzalez from SHU despite the repeatedly positive psychological reports, as well as their continuous refusal to provide Plaintiff Gonzalez with the required periodic hearings and reviews constituted a continuing violation of Plaintiff Gonzalez's constitutional rights which did not end until Plaintiff Gonzalez was released from SHU shortly after Defendant HASTY retired.

92.  Defendants SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE knew that Plaintiff Gonzalez's prolonged SHU confinement was not supported by the evidence and violated Plaintiff Gonzalez's constitutional rights by condoning, sanctioning, ratifying and aiding and abetting Defendant HASTY'S unlawful retaliatory actions.

93.  When Defendant HASTY was about to be reassigned from warden at MCC to warden at MDC, he ordered that Plaintiff Gonzalez be transferred from the SHU at MCC to the SHU at MDC in order to enable Defendant HASTY to continue to exercise control over and abuse Plaintiff Gonzalez.

94.  Defendants SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE and their agents were aware of the illegal purpose of this transfer and aided and abetted Defendant HASTY in effectuating it.

95.  Shortly before the transfer of Plaintiff Gonzalez from the MCC SHU to the MDC SHU, an officer named Aponte stated to Plaintiff Gonzalez, "you're going to MDC to be with your friend Warden Hasty." Aponte said this with a sarcastic smile, knowing that the purpose of the transfer was to enable Defendant HASTY to continue to exercise control over and abuse Plaintiff Gonzalez.

96.  Defendant LOPRESTI, as captain of security at MDC, had the authority to refuse to accept Plaintiff Gonzalez's transfer from MCC SHU to the MDC SHU.

97.  Defendant LOPRESTI accepted that transfer with the knowledge that it was being made to enable Defendant HASTY to continue to exercise control over and abuse Plaintiff Gonzalez.

98.  On September 14, 1999, Judge Whitman Knapp entered an order recommending that Plaintiff Gonzalez be transferred from MCC to another federal facility, FCI Otisville.

99.  The government consented to this transfer.

100.  Defendant HASTY refused to approve this transfer in order to enable Defendant HASTY to continue to exercise control over and abuse Plaintiff Gonzalez.

101.  Defendant HASTY was, however, willing to order defendant Gonzalez's transfer to another federal facility - MDC Brooklyn - in order to enable Defendant Hasty to continue to exercise control over and abuse Plaintiff Gonzalez.

102.  Associate Warden Charles DeRosa attempted to have Plaintiff Gonzalez transferred to Otisville without Defendant HASTY'S knowledge

103.  Defendant HASTY learned of the move and stopped it because Otisville prison officials had assured DeRosa that Plaintiff Gonzalez would be released to general population if he were transferred to that facility.

104.  DeRosa came personally to Plaintiff Gonzalez in SHU to tell him that Defendant HASTY had found out about the attempted transfer, was angry and had stopped the transfer.

105.  DeRosa apologized to Plaintiff Gonzalez and made it clear that Defendant HASTY was retaliating because of Plaintiff Gonzalez's statements to Hasty.

106. Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ and BARRERE and their agents deliberately failed to provide Plaintiff Gonzalez with written copies of the SRO's decisions and the bases for its findings, despite the fact that BOP regulations in effect during the

entire period of Plaintiff Gonzalez's SHU confinement required them to do so.  28 C.F.R. § 541.22( c)(2001).

107. Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ and BARRERE repeatedly failed to provide Plaintiff Gonzalez with the favorable psychological assessments.

108. Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ and BARRERE failed to provide Plaintiff Gonzalez with any notice, written or oral, of the purported Captain's review which was supposed to have taken place following Plaintiff Gonzalez's transfer from the MCC SHU to the MDC SHU.

109.  Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ and BARRERE continuously and repeatedly throughout the term of Plaintiff Gonzalez's SHU confinement failed to provide him with any other documents setting forth the evidence relied upon to conclude that there was a continuing need for SHU confinement.

110.  During their security rounds of the SHU, Defendants LOPRESTI, ORTIZ and BARRERE repeatedly informed Plaintiff Gonzalez that they were working to get him out of SHU, and agreed that Plaintiff Gonzalez should not continue to be confined in SHU.

111.  The documentation for any alleged administrative detention hearing which was filled out by SRO Lieutenants, Defendants ORTIZ and BARRERE, and Defendant Lopresti contained no facts or details supporting Plaintiff Gonzalez's continued need for SHU confinement, which is consistent with their repeated views that Plaintiff Gonzalez did not belong in SHU.

112.  On or about May 11, 2002, Plaintiff Gonzalez was instructed by Defendant ORTIZ to pack his belongings because he was being released from SHU.

113.  Defendant ORTIZ informed Plaintiff Gonzalez that he was being released from SHU because Defendant HASTY had been forced to retire.

114.  Defendant HASTY was forced to retire by the BOP because of the numerous complaints of abuse of detainees at MDC by inmates and staff under Defendant HASTY.

115.  On April 29, 2003, Glenn Fine, the Inspector General of the Department of Justice issued a report documenting the systematic abuse of certain inmates at MDC during the period that Defendants HASTY, SHERMAN, LOPRESTI, ORTIZ, BARRERE and WHITE were working at MDC and Plaintiff Gonzalez was confined in the SHU at MDC.

116.  Plaintiff filed 128 requests for administrative remedies just during the period that he was housed in the SHU at MCC and MDC, all but a few of which related directly to his improper SHU confinement at MCC and MDC.   (see Colvin 2012 Decl., Exh. 2).

117.  Plaintiff filed 87 administrative remedy requests during the period that he was confined in MDC SHU, almost all of which related to his confinement in MDC SHU. (see

Colvin 2012 Decl., Exh. 2).

118.   Plaintiff did not pose a threat to the security and good order of either MCC or MDC.

119. The Warden and the Regional Director failed to accurately and thoroughly respond to the issues raised in Plaintiff's Administrative Remedy requests and the appeals therefrom.

120.   Formal reviews and evaluations of Plaintiff's confinement were not conducted pursuant to policy.

121.   The reviews, evaluations and other documents which were relied upon by the BOP regional office and Central Office in denying plaintiff's appeals were false.

122.   Plaintiff was transferred from Lewisburg to MCC and then to MDC on or about April 9, 2002 at the order and direction of defendant warden Hasty.

123.   No Special Housing Review forms were prepared concerning plaintiff between February 21, 2002 and May 11, 2002. (Colvin 2013 Decl., Exh. F).

124.   Defendants have refused to provide Plaintiff with any documents relating to the reason for this transfer to USP-Lewisburg, the reason for his placement in USP-Lewisburg SHU and who directed that he be transferred to  USP-Lewisburg and placed in the USP-Lewisburg SHU.

125.   Plaintiff did not receive a detailed detention order, or any order whatsoever upon placement in SHU at MDC Brooklyn.

126. Psychological assessments at MCC and MDC were not conducted in compliance with policy during the period that plaintiff Gonzalez was confined to SHU in those facilities.

127. BOP policy required that the 30-day SHU psychological evaluation is to be considered by the SRO in making a determination about whether an inmate should be released from the SHU. (see 28 C.F.R. Ch. V (7-1-01 Edition) at § 541.22( c) ).

128.   The entries on the Special Housing Review forms contained in Colvin 2013 Decl. at exhibits E and F were all prepared at the same time and backdated to make it appear that reviews had been conducted at earlier dates.

129.   Former defendant Hess failed to conduct his SHU psychological reviews in accordance with BOP policy requirements.

130.   The phrase "a precise prediction of dangerousness is difficult and should be modified over time as individual circumstances change" is a stock phrase which appears verbatim on every SHU psychological review form (see all 8 of the psychological assessments set forth in Colvin 2013 decl. Exh. H).

131. All eight of the SHU psychological assessment forms which were completed regarding the period that plaintiff was confined to MDC SHU stated that plaintiff's current mental; status, emotional expression, and behavior do not suggest significant mental health problems," that his "adjustment to the Special Housing Unit appears to be satisfactory" and that his "risk of self-harm is judged to be LOW."

132.   Six of the eight SHU psychological assessment forms which were completed regarding the period that plaintiff was confined to MDC SHU stated that plaintiff's "potential for harm to others was judged to be LOW."

Dated: New York, New York
        March 7, 2013


                              /s/ Michael A. Young
                              _____
                              MICHAEL A. YOUNG
                              165 Christopher Street, Suite 2D
                              New York, New York, 10014
                              212-242-4336

                              Attorney for Plaintiff Esteban Gonzalez

cc.: Rachel Balaban, AUSA
        James J. Keefe, Esq.