UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
ESTEBAN GONZALEZ,                                        :
                                                         :
                              Plaintiff,                 :
                                                         :          **MEMORANDUM**
            - against -                                  :          **DECISION AND ORDER**
                                                         :
 DENNIS W. HASTY, *et al.*,                              :          12-cv-5013 (BMC) (SMG)
                                                         :
                              Defendants.                :
                                                         :
-------------------------------------------------------- X

**COGAN**, District Judge.

Plaintiff Esteban Gonzalez filed this action under <u>Bivens v. Six Unknown Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), against defendants Warden Dennis W. Hasty, Associate Warden James Sherman, Captain Salvatore LoPresti, Lieutenant Barrere, Lieutenant White, and Lieutenant Ortiz, who are all current or former federal employees of the Bureau of Prisons ("BOP"), alleging Fifth and Eighth Amendment violations.[1]  In particular, plaintiff alleges Fifth Amendment due process violations stemming from an alleged failure by defendants to conduct meaningful reviews regarding his placement in the Special Housing Unit ("SHU") of the Metropolitan Detention Center in Brooklyn ("MDC") and the Metropolitan Correction Center in Manhattan ("MCC").  Plaintiff also alleges that defendants violated his Eighth Amendment rights because the conditions of his SHU confinement at the MDC amounted to cruel and unusual punishment by prison officials.

---

[1] In his second amended complaint, plaintiff had also asserted a First Amendment claim against defendants; however, plaintiff withdrew that claim in his memorandum of law in opposition to defendants' motions for summary judgment.

Defendants moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.[2] Subsequent to plaintiff's filing of his opposition to summary judgment, the Supreme Court decided Ziglar v. Abbasi, 137 S. Ct. 1843 (2017), and because Ziglar bore directly on plaintiff's Bivens claims, the Court ordered the parties to address the impact of the Supreme Court's ruling. For the reasons that follow, the Court grants summary judgment to defendants as to both plaintiff's Fifth and Eighth Amendment claims.

## FACTUAL BACKGROUND

### A. Plaintiff's Conviction and Incarceration

On March 2, 1994, plaintiff was arrested for being a felon in possession of a firearm and placed into federal custody at the MCC. On November 1, 1994, a jury sitting in the Southern District of New York found plaintiff guilty of one count of being a felon in possession. Plaintiff was sentenced to 180 months' imprisonment, below the sentencing guidelines range of 235 to 293 months. On April 14, 1997, the Second Circuit affirmed plaintiff's conviction, but pursuant to the Government's cross-appeal, vacated the sentence and remanded for resentencing because "the district court provided no . . . explanation" for its departure from the applicable guidelines range. United States v. Gonzalez, 110 F.3d 936, 948 (2d Cir. 1997).

On February 28, 1999, while plaintiff was in federal custody at the MCC awaiting resentencing, he repeatedly stabbed a fellow inmate with a "knife-like" object, which was approximately ten inches long, sometimes colloquially referred to as a shank. Both before and after this assault, while housed in the MCC and other federal institutions, plaintiff was disciplined for other assaults and threatening bodily harm. On the same day as this assault,

_____

[2] Warden Hasty, Associate Warden Sherman, Lieutenant Barrere, Lieutenant White, and Lieutenant Ortiz, represented by the U.S. Attorney's Office, moved for summary judgment as the "federal defendants," and Captain LoPresti, represented by private counsel, also moved for summary judgment, adopting the arguments made by the federal defendants. The Court will refer to these parties simply as "defendants."

Lieutenant Mulroney of the MCC issued an administrative detention order that placed plaintiff in administrative detention in the SHU of the MCC, "pending investigation into an incident in which an inmate was assaulted on the unit." This was not the first time, nor would it be the last time, that plaintiff was disciplined while in federal custody for assault or threatening bodily harm, but this particular assault resulted in plaintiff's placement in the MCC SHU.

Broadly speaking, inmates in the SHU are under significantly greater restrictions and have significantly fewer privileges than inmates in the general population of a prison. Inmates in the general population are permitted to walk around, watch television, wash their own clothes, make telephone clothes, and socialize with inmates during the day. Inmates in the SHU are locked in a cell for 23 hours a day; their ability to go outside for recreation is limited to one hour per day Mondays through Fridays; and they have limited access to personal property.

On December 7, 2000, a second jury sitting in the Southern District of New York found plaintiff guilty of the February 1999 assault, specifically (i) assault with intent to do bodily harm, (ii) assault resulting in bodily injury, and (iii) possession of a prohibited object in prison. On January 22, 2002, plaintiff was sentenced to 150 months' imprisonment to run consecutively to any undischarged term of imprisonment. Plaintiff was also ultimately resentenced on the initial felon-in-possession charge and his combined sentence for both of his convictions was 210 months' custody. During that sentencing hearing, the Government revealed new information that (i) staff had found a shank in plaintiff's cell at another facility where he was housed during the pendency of the appeal of the original sentencing, and (ii) in the same period, plaintiff had assaulted another inmate at a separate facility.

**B.    Continued Custody in the SHU**

Plaintiff alleges that he was housed in the MCC SHU from February 28, 1999, until July 24, 2001.  On that date, July 24, 2001, he was transferred to the MDC,[3] where he was classified as a holdover inmate.  Also on that same date, defendant Lieutenant White of the MDC issued an administrative detention order, placing plaintiff in the MDC SHU for "security purposes" pending the MDC Captain's review.  Plaintiff does not recall whether he received a copy of this order or not.

On the following day, MDC intake screeners filled out and sent an intake screening memorandum to "all concerned," advising that (i) plaintiff entered the MDC and was placed in the SHU; (ii) plaintiff was transferred from the MCC, where he was federally prosecuted for three counts of assault of an inmate and one count of possession of a weapon while incarcerated; (iii) MCC reports stated that plaintiff had a long history of aggressive behavior, which included three separate instances of spitting on staff; and (iv) plaintiff's disciplinary record included threatening bodily harm, assault, fighting, and interfering with a security device.  The MDC intake memorandum was circulated to, among others, defendants Warden Hasty, Associate Warden Sherman, Captain LoPresti, and the SHU lieutenant[4] at the time.

Plaintiff remained in the MDC until March 20, 2002, at which point he was transferred to a high security prison, USP-Lewisburg, and placed in the SHU there.  On April 9, 2002, plaintiff was released on federal writ to the MCC, where he remained in the SHU while in transit.  On April 10, 2002, plaintiff arrived back to the MDC, where he again was housed in the SHU from

---

[3] This means that while plaintiff's criminal prosecution for the February 1999 assault and felon-in-possession resentencing were still proceeding in the Southern District, plaintiff spent part of his custody in the MDC in Brooklyn.

[4] The SHU lieutenant was responsible for ensuring that the SHU inmates received everything that they were entitled to, including phone calls, showers, recreation, medical visits, and food.

April 10, 2002, through April, 15, 2002. After April 15, 2002, plaintiff was released into the general population but thereafter spent certain other periods of time, which are not at issue in this litigation, in either administrative detention or disciplinary segregation.

## C.    *Reviews of Plaintiff's Custody in the SHU*

During the relevant time at the MDC, a team of MDC officials met weekly to review all SHU inmates, including plaintiff, and discuss each inmate's status in special housing. The warden (Warden Hasty),[5] associate warden (Associate Warden Sherman), captain (Captain LoPresti),[6] the SHU lieutenant (Lieutenants Barrere and Ortiz – when they were the SHU lieutenants), the heads of various departments, including from the MDC's psychology, medical, facilities, and religious departments, and Special Investigation Service ("SIS") staff all participated in these weekly meetings. The psychologists who attended the weekly meetings provided any updates regarding their reviews of the inmates and discussed issues, if any, they had regarding a particular SHU inmate. These weekly meetings were "generally 30 to 60 minute[s]" long.

The purpose of the meetings was (i) to ensure that all SHU inmates were receiving their required reviews, including the 7-day and 30-day reviews required under relevant BOP regulations; (ii) to address any questions regarding the SHU inmates; and (iii) to review whether

---

[5] Defendant Warden Hasty was the warden at the MCC at the time of the initial assault until August 13, 2000, when he became the warden of the MDC, remaining at the MDC until his retirement on April 1, 2002.

[6] Also relevant is that Captain LoPresti was the Segregation Review Official ("SRO") during plaintiff's detention in the MDC SHU. As SRO, Captain LoPresti had the authority to "release an inmate from administrative detention when reasons for placement cease to exist." As warden, Warden Hasty had this same authority. There seems to be what I would term a non-dispute over this shared authority. Plaintiff disputes that Captain LoPresti had the authority to release inmates from the SHU because Captain LoPresti testified at his deposition that he believed that, while he could "advise" Warden Hasty on whether to retain an inmate in the SHU, it was "ultimately [the Warden's] decision." I call this a non-dispute because how LoPresti understood his authority relative to Warden Hasty is beside the point of whether he actually had the authority to exercise, which he did. Moreover, that Warden Hasty could overrule Captain LoPresti is not mutually exclusive to the existence of Captain LoPresti's authority to release inmates from the SHU.

the inmate's continued housing in the SHU was appropriate. Although plaintiff has stated (and defendants do not dispute) that the SHU could hold just under 100 inmates, plaintiff offers no information as to how many inmates were in the SHU during the relevant time.

On July 27, 2001, or three days after plaintiff's transfer to the MDC, defendant Lieutenant Barrere of the MDC conducted a record review of plaintiff's placement in administrative detention in the MDC SHU. At that time, as the form reflects, Lieutenant Barrere continued plaintiff's housing in SHU because plaintiff was a "high security" inmate.[7] Thereafter, Lieutenant Barrere conducted weekly record reviews of plaintiff's placement in the SHU on August 7, 2001; August 14, 2001; and August 21, 2001; and after each review, he made the decision to continue plaintiff's detention in the SHU as a "high security" inmate.

On August 23, 2001, MDC psychologist Parry Hess conducted a psychological review of plaintiff and prepared a written assessment for the SRO, Captain LoPresti. In connection with this psychological review, Dr. Hess sought to interview plaintiff, but plaintiff refused to be interviewed. Dr. Hess concluded that plaintiff presented a potential risk of harm to others. In his written assessment, Dr. Hess noted that a precise prediction of dangerousness was difficult to render, and therefore the assessment should be revisited and modified over time as individual circumstances change (the "prediction difficulty caveat"). Dr. Hess determined that plaintiff's current potential for harm to others was "moderate."

---

[7] As with this review and all subsequent ones, plaintiff does not deny the preparation of the forms; rather, he disputes the meaningfulness of the reviews themselves. In particular, he disputes whether the reviews were conducted consistent with regulations and avers that he never received any copies or given the opportunity to appear at these reviews. Finally, he argues that the reasons put on these forms, including "high security" and "history of assault" are not proper bases for maintaining his housing in the SHU.

On August 24, 2001, plaintiff appeared before Captain LoPresti for his 30-day review. Captain LoPresti continued plaintiff's housing in the SHU, determining that plaintiff was a high security inmate, based on plaintiff's designated institution of USP-Lewisburg and plaintiff's history of assault.

At some point in August 2001, Lieutenant Barrere was no longer a SHU lieutenant, nor did he become a SHU lieutenant again during the remainder of plaintiff's detention in the MDC SHU. From approximately August 28, 2001, to approximately February 5, 2002, defendant Lieutenant Ortiz, in his role as the SHU lieutenant, conducted the weekly record reviews of plaintiff's placement in the SHU and prepared the required SHU review forms.

Lieutenant Ortiz conducted weekly record reviews of plaintiff's placement in the SHU on August 28, 2001; September 4, 2001; September 11, 2001; and September 18, 2001; and after each review, he made the decision to continue plaintiff's detention in the SHU, highlighting plaintiff's "high security" status and reason for placement as "history of assaultive behavior." Lieutenant Ortiz had multiple communications with plaintiff. During those communications, plaintiff had the opportunity to express, and did express, his concerns about his continued SHU confinement.

On September 23, 2001, MDC psychologist Florence Tam conducted a psychological review of plaintiff and prepared a written assessment for the SRO, Captain LoPresti. In her written assessment, Dr. Tam stated the prediction difficulty caveat and assessed that plaintiff's current potential for harm to others was "low." In addition, Dr. Tam found that plaintiff's "mood was agitated because [plaintiff] did not think that he should be housed in SHU." Dr. Tam also observed that plaintiff "believed that Psychology Services should interfere with his placement,"

but she "explained to this inmate that Psychology Services have no barrings [sic] on his housing status."

On the following day, September 24, 2001, plaintiff appeared before Captain LoPresti for his 30-day review of his status in the SHU. Captain LoPresti continued plaintiff's housing in the SHU, noting plaintiff's high security status and "history of assaultive behavior."

Lieutenant Ortiz continued conducting weekly record reviews of plaintiff's placement in the SHU on September 25, 2001; October 2, 2001; October 9, 2001; October 16, 2001; and October 23, 2001; and after each review, he made the decision to continue plaintiff's detention in the SHU, noting plaintiff's "high security" status and "history of assaultive behavior."

On October 3, 2001, MDC psychologist Florence Tam conducted another psychological review of plaintiff and prepared a written assessment for the SRO. In her written assessment, Dr. Tam stated the prediction difficulty caveat and then assessed that plaintiff's current potential for harm to others was "low." Dr. Tam also noted that, in response to plaintiff's anger that Psychology Services was not doing their job to get him out of the SHU, she informed plaintiff that "Psychology Services do [sic] not have the authority to determine his housing status."

On October 24, 2001, plaintiff appeared before Captain LoPresti for his 30-day review of his status in the SHU. Captain LoPresti again continued plaintiff's housing in the SHU, noting plaintiff's high security status and "history of assaultive behavior."

On October 30, 2001, Lieutenant Ortiz conducted a record review of plaintiff's placement in administrative detention and decided to continue plaintiff's housing in the SHU, noting plaintiff's high security status and "history of assaultive behavior."

On October 31, 2001, MDC psychologist Florence Tam conducted another psychological review of plaintiff and prepared a written assessment for the SRO. In her written assessment, Dr.

8

Tam stated the prediction difficulty caveat and then assessed that plaintiff's current potential for harm to others was "low."

Lieutenant Ortiz continued conducting weekly record reviews of plaintiff's placement in the SHU on November 6, 2001; November 13, 2001; and November 20, 2001; and after each review, he made the decision to continue plaintiff's detention in the SHU, noting plaintiff's "high security" status and "history of assaultive behavior."

On November 21, 2001, MDC psychologist Lorie Nicholas conducted a psychological review of plaintiff and prepared a written assessment for the SRO. In her written assessment, Dr. Nicholas stated the prediction difficulty caveat and then assessed that plaintiff's current potential for harm to others was "low."

Two days later, November 23, 2001, plaintiff appeared before Captain LoPresti for his 30-day review of his status in the SHU. Captain LoPresti continued plaintiff's housing in the SHU, noting plaintiff's high security status and "history of assaultive behavior."

Lieutenant Ortiz continued conducting weekly record reviews of plaintiff's placement in the SHU on November 27, 2001; December 4, 2001; December 11, 2001; and December 18, 2001; and after each review, he made the decision to continue plaintiff's detention in the SHU, noting plaintiff's "high security" status and "history of assaultive behavior."

On December 21, 2001, MDC psychologist Emily Streeter conducted a psychological review of plaintiff and prepared a written assessment for the SRO. In her written assessment, Dr. Streeter stated the prediction difficulty caveat and then assessed that plaintiff's current potential for harm to others was "low."

Two days later, on December 23, 2001, plaintiff appeared before Captain LoPresti for his 30-day review of his status in administrative detention. Captain LoPresti continued plaintiff's housing in the SHU, noting plaintiff's high security status and "history of assaultive behavior."

Lieutenant Ortiz continued conducting weekly record reviews of plaintiff's placement in the SHU on December 25, 2001; January 1, 2002; January 8, 2002; and January 15, 2002; and after each review, he made the decision to continue plaintiff's detention in the SHU, noting plaintiff's "high security" status and "history of assaultive behavior."

On January 18, 2002, MDC psychologist Lisa Hope conducted a psychological review of plaintiff and prepared a written assessment to the SRO. In her written assessment, Dr. Hope stated the prediction difficulty caveat and then assessed that plaintiff's current potential for harm to others was "low."

On January 22, 2002, plaintiff appeared before Captain LoPresti for his 30-day review of his status in administrative detention. Captain LoPresti continued plaintiff's housing in the SHU, noting plaintiff's high security status and "history of assaultive behavior."

Lieutenant Ortiz continued conducting weekly record reviews of plaintiff's placement in the SHU on January 22, 2002; January 29, 2002; and February 5, 2002; and after each review, he made the decision to continue plaintiff's detention in the SHU, noting plaintiff's "high security" status and "history of assaultive behavior.

On February 13, 2002, MDC psychologist Parry Hess conducted a psychological review of plaintiff and prepared a written assessment for the SRO. In his written assessment, Dr. Hess stated the prediction difficulty caveat and then assessed that plaintiff's current potential for harm to others was "moderate." In addition, Dr. Hess noted that plaintiff's "history of violent crime, his repeated aggressive behavior in jail, his current labile mood, and his expression of

interpersonal distrust suggest a moderate to high risk of future assaultive behavior." Dr. Hess also observed that plaintiff's "immediate risk of violence is much lower, given his restrictive housing assignment and given no signs of current violent plans or thoughts."

On February 21, 2002, plaintiff appeared before Captain LoPresti for his 30-day review of his status in administrative detention. Captain LoPresti continued plaintiff's housing in the SHU, noting plaintiff's high security status and "history of assaultive behavior."

Although BOP could not locate the "Special Housing Review" forms reflecting plaintiff's housing in the SHU for the three-week period from February 22, 2002, through March 16, 2002, "Special Housing Unit Record" forms reflect that during this time, plaintiff was offered showers, meals, and recreation on a regular basis. Additionally, the SHU Record establishes that medical department personnel made daily rounds in the SHU.

After plaintiff was transferred to USP-Lewisburg on March 20, 2002, plaintiff appeared before a BOP official at USP-Lewisburg on March 24, 2002, for a formal review of plaintiff's status in administrative housing. USP-Lewisburg staff determined that plaintiff would be housed in the SHU. USP-Lewisburg staff conducted weekly record reviews of plaintiff's placement in the SHU at USP-Lewisburg on March 31, 2002, and April 7, 2002, and continued plaintiff's custody in the SHU. On April 11, 2002, after plaintiff returned to the MDC, Lieutenant Wilkens issued an administrative detention order, placing plaintiff in administration detention in the SHU pending the Captain's review.

### D.  Conditions During Plaintiff's Time in the SHU at the MCC and MDC

While in the MDC SHU, plaintiff had his own shower, toilet, and sink in his cell; the water was constantly on, and plaintiff could shower more than three times a week. While in the MCC SHU, showers were not in the inmate's cell, and plaintiff would take showers about three

times a week.  However, plaintiff alleges that while incarcerated in the SHU (and he does not specify which one), he was provided with used and dirty razors, which left him exposed to contracting communicable diseases from the previous user should he use the razors.[8]

While in the MCC and MDC SHUs, plaintiff could buy various items from the institutions' commissaries, including food items, postage stamps, and hygiene products (though there is a dispute as to whether food and hygiene items were available for purchase in the commissary at all times).

While in the MCC and MDC SHUs, plaintiff was provided with food three times a day with a different menu.  While in the MDC SHU, plaintiff received outdoor recreation.[9]  At certain times while in the MCC SHU, including following the February 1999 assault, plaintiff was limited to indoor recreation because outdoor recreation was on the MCC roof with all other SHU inmates.  (Plaintiff argues that he should have been allowed outdoor recreation with the other MCC SHU inmates the very day after his 1999 stabbing of a fellow inmate.)

While in the MCC and MDC SHUs, plaintiff had "a lot" of legal visits with his attorneys. While in the MCC and MDC SHUs, plaintiff did not have any complaints regarding his ability to have social visits.  While in the MCC and MDC SHUs, plaintiff had access to recreational books and materials, including "Men's Journal" and "Stuff Magazine."  While in the MCC and MDC SHUs, plaintiff had access to a radio for "most of the time," but at some point, the BOP took radios away from all SHU inmates.

In the MCC and MDC SHUs, inmates were responsible for cleaning their own cells and were provided with appropriate cleaning supplies.  During his time in the SHU, plaintiff was

---

[8] There are no contemporaneous complaints as to this allegation, as there are for most of the other complaints, but plaintiff testified to this condition during his deposition.

[9] Plaintiff complains that his outdoor recreation was frequently at 6:00 am, when it was often still dark outside.

moved into a new cell approximately every two to three weeks. This meant that, if the previous inmate had left his cell dirty, plaintiff had to live in that dirty condition until he cleaned his new cell. Plaintiff testified at his deposition that, on many occasions, he did not receive sufficient cleaning supplies. Plaintiff's February 14, 2002 administrative complaint raised his issues with inadequate cleaning supplies (wherein he noted that he should be provided with sufficient cleaning supplies to be able to clean his cell three times every week), and in response, plaintiff received a new mop with a detachable mop-head. Additionally, at times, there were roaches and mice in plaintiff's cell in the MCC SHU. Plaintiff also testified that his cell was very cold during the winter and that he was not provided enough clothing to stay warm.

While in the MDC SHU, plaintiff worked as an orderly. As an orderly, plaintiff was given the opportunity to come out of his cell more often to carry out his responsibilities. While in the MDC SHU, plaintiff also received "extra privileges" and courtesy or discretionary treatment, which included extra trays of food, extra cleaning supplies for his cell, extra commissary items from the general population commissary list, additional time in the law library, and the ability to wash his own clothes by themselves in a washer and dryer.[10] Plaintiff characterizes this additional discretionary treatment as a result of his agreement to refrain from filing complaints about the conditions of his confinement.

Plaintiff also was allowed "[e]xtra time to go out into the recreation yard, if it was empty." He testified at his deposition that, "If I'm out there cleaning and I finished cleaning, maybe just to go out and get some air and walk out there, the door is open, I can walk out there into the recreation yard. There is nobody in there." Plaintiff also testified that there were

---

[10] Although he was given the ability to wash his own clothing, plaintiff also alleges that while incarcerated, he was given used and dirty clothing, including underclothing that was "soiled and had pubic hairs from other inmates in it." It is unclear whether this alleged condition occurred in the MCC or in the MDC before he began washing his own clothes.

"probably some other small things like [the extra recreation], that made life a little bit more bearable for me, especially at that late stage of the confinement. Anything that would make my life a little bit better is obviously important."

While incarcerated in the SHU, plaintiff contends that the defendants made it difficult for him to see a dentist or to have regular access to dental hygiene supplies. While incarcerated in the SHU, plaintiff contends that his body began to deteriorate because he was not given shoes with proper support, and as a result, sometime after he left the SHU, he fell and suffered a knee injury for which he did not receive timely medical care.

### E.    *Plaintiff's Administrative Complaints*

Plaintiff filed three administrative complaints in which he claimed that he was improperly confined in the MDC SHU and requested his release; those requests were dated February 14, 2002; February 22, 2002; and February 24, 2002. Plaintiff's three February 2002 requests were denied by the BOP Central Office respectively on July 2, 2002; August 8, 2002; and June 20, 2002.

Specifically, on February 14, 2002, plaintiff submitted a Form BP-9, alleging that Lieutenant Ortiz and Captain LoPresti had informed him that he would be released to the MDC general population were it not for the determination by Warden Hasty that he should remain in the SHU. Plaintiff claimed that Warden Hasty had no legitimate reason to hold him in the SHU, that plaintiff had not been given a meaningful opportunity to contest his incarceration in the SHU pursuant to 28 C.F.R. § 541.22, and thus, he demanded his release from the SHU. On March 8, 2002, this request was denied by Warden Hasty on grounds that included plaintiff's prior disciplinary history and security concerns. On March 12, 2002, plaintiff appealed this determination to the BOP regional office. On April 22, 2002, the appeal was denied. On May 2,

2002, plaintiff further appealed this determination to BOP's Central Office. On July 2, 2002, the BOP Central Office denied his appeal and informed plaintiff that he "posed a threat to the security and good order of the institution."

On February 22, 2002, plaintiff filed another Form BP-9, alleging that no periodic reviews were being conducted regarding his incarceration in the SHU and that the forms documenting such reviews were being forged by MDC staff other than defendants. Plaintiff further claimed that the administrative detention order confining him to the SHU was insufficiently detailed and that he had not been given an opportunity to challenge it. Finally, he claimed that the psychological reviews performed on him were inadequate.

On April 8, 2002, MDC Warden Zenk, who was Warden Hasty's successor at the MDC following his retirement, denied this request. Warden Zenk stated in the denial letter that "[a]n investigation revealed that the Segregation Review Officer has conducted formal reviews with you on a consistent basis. The reviewing official has informed you of your status as 'High Security' and you[r] reason for placement in the Special Housing Unit." On April 25, 2002, plaintiff appealed this determination, and his appeal was denied on June 3, 2002. In the June 3rd denial letter, the BOP Regional Director stated that "[a]n investigation into your appeal revealed that you received a detailed detention order upon placement in SHU at MDC Brooklyn. Additionally, while you were housed in the SHU, you received formal SHU reviews and evaluations in compliance with policy. You have presented no evidence that the SHU reviews were forged documents." On June 11, 2002, plaintiff appealed to the BOP Central Office, and on August 8, 2002, the BOP Central Office denied his appeal, finding that "the Warden and the Regional Director ha[d] accurately and thoroughly responded to [plaintiff's] issue[s]."

On February 24, 2002,[11] plaintiff filed a Form BP-9 that related to the psychiatric evaluations plaintiff had received from MDC psychologist Dr. Parry Hess in connection with his SHU incarceration.  Plaintiff alleged that the psychologist's evaluations did not conform to the requirements of 28 C.F.R. § 541.22 in that they were insufficiently thorough and did not include all relevant factors.  Plaintiff claimed that a more detailed evaluation would demonstrate that he should be released from the MDC SHU.  On March 13, 2002, this request was denied.  On March 19, 2002, plaintiff appealed to the BOP regional office, and this appeal was rejected on April 19, 2002.  In the April 19 determination, the BOP Regional Director stated that "[a]n investigation into your appeal revealed that psychological assessments at MDC Brooklyn are conducted in compliance with policy. . . . According to policy, the 30-day SHU evaluation is not used to make a determination about your release from the SHU."  Plaintiff appealed to BOP's Central Office on April 28, 2002, and on June 20, 2002, the Central Office denied plaintiff's appeal, informing him that "formal reviews and evaluations [of plaintiff's confinement] were conducted pursuant to policy."

Plaintiff also used other means to voice his complaints.  Specifically, on February 13, 2002, plaintiff submitted a Form BP-8 Inmate Request for Informal Resolution, which was denied.  Plaintiff also recalls having conversations with defendant Associate Warden Sherman on a "few occasions," during which he complained about his SHU conditions.  In response, Associate Warden Sherman generally said, "I'll look into it."  Plaintiff surmises that Associate Warden Sherman allowed plaintiff to be kept in the SHU without due process, further contending that Associate Warden Sherman did nothing to ameliorate or change plaintiff's SHU conditions.

[11] There are two February 24, 2002 complaints, the one discussed in this paragraph regarding his demand for release from the SHU, and a second complaint where he alleged that Captain LoPresti told plaintiff to withdraw his other administrative complaints (related to the removal of his radio, the availability of commissary items, and his light switch), or he would no longer have his orderly job, extra privileges, or courtesy or discretionary treatment.

### F. Meaningfulness of Reviews

As detailed above, the SHU lieutenant would review plaintiff's detention in the SHU every week, and Captain LoPresti conducted 30-day reviews of plaintiff's detention in the SHU, during which plaintiff would appear. One of the purposes of the 30-day "formal" hearing was to determine whether an inmate will remain in the SHU. Plaintiff states that he did not attend, and was never given the opportunity to attend, any 30-day formal hearings while incarcerated at the MDC, notwithstanding that he raised this issue separately with each of: (i) Warden Hasty, (ii) Associate Warden Sherman, (iii) Captain LoPresti, and (iv) Lieutenant Barrere. However, the documentary record is undisputed that he appeared before Captain LoPresti on numerous occasions at 30-day intervals, so the dispute centers on plaintiff's perception of what those meetings were.[12]

Plaintiff argues that the monthly "formal" hearings were supposed to be conducted by, or under the authority of the Captain in charge of the SHU. As the above recitation of reviews shows, Captain LoPresti did conduct plaintiff's 30-day reviews while he was in the MDC. Notwithstanding, plaintiff points out that Captain LoPresti testified, in response to a hypothetical question, that sometimes he delegated the duties of performing monthly formal hearings to lieutenants like Lieutenant Ortiz, even though lieutenants lacked the authority to release, or even to recommend the release, of an individual from the SHU. There are no facts to suggest that any SHU lieutenant conducted plaintiff's 30-day reviews, however.

---

[12] Captain LoPresti testified at his deposition that he did not recall whether he held the formal 30-day hearings with plaintiff, but the contemporaneous documents indicate that he did. Plaintiff suggests that these documents were falsified because Captain LoPresti was convicted in 2008 of "making false statements" with respect to other conduct at the MDC in 2002. There is no support for this speculation. The facts of Captain LoPresti's criminal prosecution and conviction are vastly different: In <u>United States v. LoPresti</u>, 07 Cr. 273 (CBA) (E.D.N.Y.), several individuals including LoPresti were charged with beating an inmate, trying to cover up the beating by staging his cell to appear as if the inmate had tried to hang himself, and then continuing this cover-up via falsified incident memoranda. Nothing remotely suggests that LoPresti falsified plaintiff's SHU review records.

**DISCUSSION**

## I. Legal Framework

In <u>Bivens</u>, the Supreme Court recognized "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." <u>McGowan v. United States</u>, 825 F.3d 118, 123 (2d Cir. 2016) (quoting <u>Corr. Servs. Corp. v. Malesko</u>, 534 U.S. 61, 66 (2001)). There, the Supreme Court implied a private right of action under the Fourth Amendment for an unreasonable search and seizure claim against FBI agents for handcuffing a man in his own home without a warrant. <u>Bivens</u>, 403 U.S. at 389. Since then, the Supreme Court has recognized <u>Bivens</u> claims in only two more particular circumstances: (1) under the Fifth Amendment's due process clause for gender discrimination against a Congressman for firing his female secretary, <u>Davis v. Passman</u>, 442 U.S. 228 (1979), and (2) under the Eighth Amendment's prohibition on cruel and unusual punishment against prison officials for failure to treat an inmate's asthma which led to his death, <u>Carlson v. Green</u>, 446 U.S. 14 (1980).

Although <u>Carlson</u> and <u>Davis</u> were handed down within a decade of <u>Bivens</u>, they mark the beginning of a still-unbroken period of nearly 40 years since the Supreme Court has authorized a <u>Bivens</u> damages action covering the exercise of any other constitutional right. This supports the majority's observation in <u>Malesko</u> that, since <u>Bivens</u>, "we have retreated from our previous willingness to imply a cause of action where Congress has not provided one," 534 U.S. at 67 n.3, and the even stronger observation of two Justices that

> <u>Bivens</u> is a relic of the heady days in which this Court assumed common-law powers to create causes of action – decreeing them to be 'implied' by the mere existence of a statutory or constitutional prohibition. . . . [W]e have abandoned that power to invent "implications" in the statutory field. There is even greater reason to abandon it in the constitutional field, since an "implication" imagined in the Constitution can presumably not even be repudiated by Congress.

<u>Malesko</u>, 534 U.S. at 75 (Scalia, J., concurring) (internal citations omitted).

Notwithstanding the Supreme Court's retreat, lower courts have relied on Bivens as a blueprint for implying causes of action. Although acknowledging that the judicial damage remedy in Bivens itself is "extraordinary," one that should rarely be applied in "new contexts," Arar v. Ashcroft, 585 F.3d 559, 571 (2d Cir. 2009) (*en banc*) (quoting Malesko, 534 U.S. at 69), lower courts have still recognized additional implied rights of action premised on certain constitutional rights.

Recently, the Supreme Court reiterated that courts should not imply rights and remedies as a matter of course, "no matter how desirable that might be as a policy matter, or how compatible with the statute [or constitutional provision]." Ziglar, 137 S. Ct. at 1856 (quoting Alexander v. Sandoval, 532 U.S. 275, 286-87 (2001)). "Given the notable change in the [Supreme] Court's approach to recognizing implied causes of action . . . the Court has made clear that expanding the Bivens remedy is now a 'disfavored' judicial activity." Id. at 1848 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).

Ziglar also made it clear that the *only* recognized implied rights of action were the narrow situations presented in Bivens, Davis, and Carlson, and lower courts must scrutinize attempts to expand the Bivens remedy, even where courts had assumed the availability of such a remedy. See 137 S. Ct. at 1865 (vacating the Second Circuit's holding in Turkmen v. Hasty, 789 F.3d 218 (2015) (panel decision); Turkmen v. Hasty, 808 F.3d 197 (2015) (*en banc*), for failure to conduct the appropriate analysis as to the availability of a Bivens implied right of action). Practically speaking, this means that even where a circuit court had previously found a Bivens remedy, that court must still consider the availability of an implied right of action in subsequent cases relying on the same precedent. See Vanderklok v. United States, No. 16-3422, 2017 WL 3597711, at *6 (3d Cir. Aug. 22, 2017) (holding that, even though the Third Circuit had previously found a

<u>Bivens</u> remedy in a First Amendment retaliation context, that precedent no longer holds in light of <u>Ziglar</u> and the court "must look at the issue anew in this particular context, and as it pertains to this particular category of defendants").

Thus, this Court must also look "anew" at the particular facts in this case.[13]  In doing so, this Court is guided by additional principles handed down by the Supreme Court.  As an initial matter, even though the Supreme Court has recognized causes of action in <u>Bivens</u> under the Fourth Amendment, in <u>Davis</u> under the Fifth Amendment, and in <u>Carlson</u> under the Eighth Amendment, that does not mean that any cause of action may lie under those Amendments simply by virtue of these Supreme Court cases.  In fact, the Supreme Court has refused to extend <u>Bivens</u> contexts beyond the specific clauses of the specific amendments for which a cause of action had been implied, or even to other classes of defendants facing liability under those same clauses.  <u>Compare</u> <u>Davis</u>, 442 U.S. at 243-44 (permitting <u>Bivens</u> action against a Congressman for violation of an employee's Fifth Amendment due process rights) <u>with</u> <u>Schweiker v. Chilicky</u>, 487 U.S. 412, 428-29 (1988) (refusing to permit a <u>Bivens</u> action in a social security context for violations of Fifth Amendment due process rights).  <u>See also</u> <u>Wilkie v. Robbins</u>, 551 U.S. 537, 541 (2007) (refusing to extend <u>Bivens</u> to invasion of property rights under the Fifth Amendment); <u>Malesko</u>, 534 U.S. at 63 (refusing to extend <u>Bivens</u> to alleged Eighth Amendment violations by employees of private prisons).

Instead, the recognition of a cause of action is context-specific, and the Supreme Court has established a rigorous inquiry that courts must use before implying a <u>Bivens</u> cause of action

---

[13] In reversing this Court's statute of limitations analysis, the Second Circuit assumed *arguendo* that a <u>Bivens</u> remedy is available here.  <u>See</u> <u>Gonzalez v. Hasty</u>, 802 F.3d 212 (2d Cir. 2015).  But the only issue before the Circuit was the statute of limitations; it never conducted any <u>Bivens</u> analysis.  The Circuit's assumption *in arguendo* does not prevent this Court from determining whether <u>Bivens</u> should be extended here.  Rather, the Circuit's holding that a remedy "may" exist, together with the Supreme Court's mandate in <u>Ziglar</u>, supports this Court's decision to consider the particular facts of the case and determine whether a <u>Bivens</u> remedy is available.

in a new context or against a new category of defendants.  <u>Wilkie</u>, 551 U.S. at 550.  In

accordance with that inquiry and as emphasized recently in <u>Ziglar</u>, a court must first ascertain

whether a plaintiff's claims arise in a new <u>Bivens</u> context.  "If the case is different in a

meaningful way from previous <u>Bivens</u> cases decided by [the Supreme Court], then the context is

new."  <u>Ziglar</u>, 137 S. Ct. at 1859.  The Supreme Court did not offer an "exhaustive list of

differences that are meaningful enough to make a given context a new one," but it did offer

examples that "might prove instructive."  <u>Id.</u> at 1859-60.  The Court held that

> A case might differ in a meaningful way because of the rank of the officers
> involved; the constitutional right at issue; the generality or specificity of the
> official action; the extent of judicial guidance as to how an officer should respond
> to the problem or emergency to be confronted; the statutory or other legal
> mandate under which the officer was operating; the risk of disruptive intrusion by
> the Judiciary into the functioning of other branches; or the presence of potential
> special factors that previous <u>Bivens</u> cases did not consider.

<u>Id.</u> at 1860.

If the context is new, then the court must next ask "whether any alternative, existing

process for protecting the interest amounts to a convincing reason for the Judicial Branch to

refrain from providing a new and freestanding remedy in damages."  <u>Wilkie</u>, 551 U.S. at 550.

Irrespective of whether an alternative remedy exists, a federal court must also conduct a specific

analysis, "paying particular heed . . . to any special factors counselling hesitation before

authorizing a new kind of federal litigation," otherwise known as the "special factors analysis."

<u>Id.</u> (internal quotation marks omitted).  "The Court's precedents now make clear that a <u>Bivens</u>

remedy *will not be available* if there are special factors counselling hesitation in the absence of

affirmative action by Congress."  <u>Ziglar</u>, 137 S. Ct. at 1857 (internal quotation marks omitted

and emphasis added).

Although the Supreme Court "has not has not defined the phrase 'special factors counselling hesitation,'" the Court has observed that "[t]he necessary inference, though, is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." Id. at 1857-58. Put more simply, "to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." Id. at 1858.

## II.    Analysis

### A.  The Fifth Amendment Claim

Plaintiff's Fifth Amendment claim presents a new context, necessitating an alternative-remedies and special-factors analyses. There are two reasons supporting this conclusion. First, all can agree that the Supreme Court has not recognized a specific Bivens remedy for a Fifth Amendment due process claim relating to the alleged failure by prison employees to conduct "meaningful" reviews of a plaintiff's placement in the SHU while in federal custody. Thus, plaintiff's Fifth Amendment claim necessarily asks this Court to create a Bivens remedy for his claim.

Second, Ziglar's facts compel the Court to hold that the Fifth Amendment claim arises in a new context. Because plaintiff's Fifth Amendment due process claim here parallels the Fifth Amendment claim raised in Ziglar, discussion of that case is relevant and useful to the present analysis. The Ziglar plaintiffs were six men of Arab or South Asian descent, who were detained for periods of three to six months at the MDC following the September 11, 2001 terrorist attacks. They filed a Bivens action against former Attorney General John Ashcroft, former Federal Bureau of Investigation Director Robert Mueller, former Immigration and Naturalization Service

Commissioner James Ziglar, Warden Hasty (a defendant in the present action), and Assistant

Warden Sherman (also a defendant in this case, but Sherman was subsequently removed from

Ziglar), alleging that the defendants had violated BOP policy by subjecting the plaintiffs to

physical and verbal abuse, arbitrary strip searches, prolonged detention under harsh conditions,

and non-access to grievance procedures, in violation of the Fourth and Fifth Amendments.  The

Ziglar plaintiffs alleged that they remained confined in those conditions even though "the

Government had no reason to suspect them of any connection to terrorism, and thus had no

legitimate reason to hold them for so long in these harsh conditions."  137 S. Ct. at 1853.

Although recognizing that the Ziglar claims had "significant parallels" to those raised in

Carlson, which allowed a Bivens action where an inmate plaintiff claimed an Eighth Amendment

violation for failure to provide medical treatment, the Supreme Court ultimately found that the

Ziglar plaintiffs were seeking to "extend Carlson to a new context," and "even a modest

extension is still an extension."  Id. at 1864.  Moreover, because the claims were predicated on

the Fifth Amendment, that was distinct on its face from the Eighth Amendment claim raised in

Carlson.

In the instant case, plaintiff's Fifth Amendment due process allegations are very similar

to the Fifth Amendment allegations raised in Ziglar.  Although plaintiff does not allege verbal or

physical abuse, he alleges that defendants continued his placement in the SHU in violation of his

Fifth Amendment due process right to "meaningful" 7-day and 30-day reviews, even though he

had no disciplinary incidents during his SHU confinement and his psychological examinations

mostly found that he presented a low risk of harm to himself and others.  Consistent with the

Supreme Court's holding that the Fifth Amendment claim did not fall within the context of

Carlson, this Court must adhere to that controlling precedent:  Because there is no recognized

Bivens remedy for plaintiff's Fifth Amendment claim, it follows that this is a new context, which requires an alternative-remedy and special-factors analysis.

Moving to the next step in the analysis, it is clear that plaintiff had alternative remedies available to him and that there are special factors counseling against the creation of a new claim here. First, "when alternative methods of relief are available, a Bivens remedy usually is not." Ziglar, 137 S. Ct. at 1863. Here, plaintiff had two remedies – the administrative complaints he filed (though unsuccessful) and the filing of a writ of habeas corpus, pursuant to 28 U.S.C. § 2241. See Carmona v. U.S. Bureau of Prisons, 243 F.3d 629, 632 (2d Cir. 2001) ("A writ of habeas corpus under § 2241 is available to a federal prisoner who does not challenge the legality of his sentence, but challenges instead its execution subsequent to his conviction.").

This habeas relief is generally conditioned on the exhaustion of a multi-step administrative remediation process, see id. at 634; 28 C.F.R. §§ 542.10-542.19, and this actually confirms the availability of both non-judicial, administrative remedies, as well as judicial remedies, for plaintiff to challenge his conditions of confinement. The existence of an "alternative, existing process" to resolve an issue, whether judicial or non-judicial, "constitutes a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." Minneci v. Pollard, 565 U.S. 118, 125-26 (2012) (internal quotation marks omitted).

In fact, even the Ziglar Court recognized that habeas may be a superior remedy, noting that "a successful habeas petition would have required officials to place respondents in less-restrictive conditions immediately; yet this damages suit remains unresolved some 15 years later." Ziglar, 137 S. Ct. at 1863. That observation has particular application here, since we are nearing 20 years since the events of which plaintiff complains.

Even with the presence of adequate non-<u>Bivens</u> remedies, I still must consider whether there are any "special factors counseling hesitation before authorizing a new kind of federal litigation." <u>Wilkie</u>, 551 U.S. at 550 (internal quotation marks omitted). There are several factors that give me pause. First, the Supreme Court has instructed that courts should exercise caution in creating a remedy for damages, particularly damages from a constitutional violation, as creating such a remedy is most often the responsibility of Congress, rather than the courts. The critical question is "'who should decide' whether to provide for a damages remedy, Congress or the courts?" <u>Ziglar</u>, 137 S. Ct. at 1857 (quoting <u>Bush v. Lucas</u>, 462 U.S. 367, 380 (1983)). Most often, the answer is Congress, because "[w]hen an issue involves a host of considerations that must be weighed and appraised, it should be committed to those who write the laws rather than those who interpret them." <u>Id.</u> (internal quotation marks and citations omitted).

Courts should recognize that "'Congress is in a far better position than a court to evaluate the impact of a new species of litigation' against those who act on the public's behalf." <u>Wilkie</u>, 551 U.S. at 562 (quoting <u>Bush</u>, 462 U.S. at 389). In addition, <u>Ziglar</u> restates the point that a damages remedy against individual federal officers in their personal capacities imposes "substantial costs, in the form of defense and indemnification," as well as burdens "resulting from the discovery and trial process." 137 S. Ct. at 1856. That further counsels hesitation when deciding whether to recognize a damages remedy against individual officers.

Second, there is very good support for the conclusion that Congress does not want a <u>Bivens</u> remedy in this context. "[L]egislative action suggesting that Congress does not want a damages remedy is itself a fact counseling hesitation." <u>Ziglar</u>, 137 S. Ct. at 1865. Congress has been active in the area of prisoners' rights and its actions do not support the creation of a new <u>Bivens</u> claim. As the Supreme Court pointed out,

Some 15 years after Carlson was decided, Congress passed the Prison Litigation Reform Act of 1995 [("PLRA")], which made comprehensive changes to the way prisoner abuse claims must be brought in federal court. So it seems clear that Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs. . . . [T]he Act itself does not provide for a standalone damages remedy against federal jailers. It could be argued that this suggests Congress chose not to extend the Carlson damages remedy to cases involving other types of prisoner mistreatment.

Id. (internal citations omitted). Moreover, the PLRA's scope squarely covers the complaints plaintiff raises here: "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). "The purpose of the PLRA is to reduce the quantity and improve the quality of prisoner suits and to afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." Amador v. Andrews, 655 F.3d 89, 96 (2d Cir. 2011) (alterations and internal quotation marks omitted).

Of course, administrative procedures or a habeas petition provides no avenue for monetary recovery, unlike a Bivens action. But there is no precedent suggesting that the unavailability of money is a factor that carries any weight in determining the expansion of a Bivens remedy. Rather, the emphasis is simply on the existence of an avenue to protect the right, not the method of protection that Congress or the Executive has chosen. The Supreme Court's reasoning in Bush, which is based in part on the comprehensive administrative scheme for redressing the type of First Amendment grievances plaintiff had claimed there, is also instructive:

The question is not what remedy the court should provide for a wrong that would otherwise go unredressed. It is whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue. That question obviously cannot be answered

simply by noting that existing remedies do not provide complete relief for the plaintiff. The policy judgment should be informed by a thorough understanding of the existing regulatory structure and the respective costs and benefits that would result from the addition of another remedy for violations of employees' First Amendment rights.

462 U.S. at 388.

Thus, in light of Supreme Court precedent, past and very recent, there are significant special factors that give me pause, and in this context, there is reason to "fear that a general Bivens cure would be worse than the disease." Wilkie, 551 U.S. at 561.

None of plaintiff's argument in support of a Bivens remedy are persuasive. First, plaintiff argues, somewhat astoundingly, that Ziglar effected no change to the availability of Bivens remedies in the Second Circuit for plaintiff's Fifth and Eighth Amendment claims.[14] Specifically, he argues that Ziglar did not specifically overrule Tellier v. Fields, 280 F.3d 69 (2d Cir. 2000), and Arar v. Ashcroft, 585 F.3d 559 (2d Cir. 2009). There are several problems with this argument. In the first instance, Arar did not recognize a Fifth Amendment Bivens cause of action – in fact the Circuit declined to extend Bivens to cover Arar's treatment. Tellier is closer to the facts of this case because there, plaintiff had alleged he was confined to the SHU for over a year without hearings, but there are still very important distinctions that take this case out of Tellier's realm. As an initial matter, in Tellier, there did not appear to be the same documentary evidence of reviews as there are here, such that the right is actually different: Gonzalez's alleged right to "meaningful" review versus the right to reviews generally in Tellier.

---

[14] Part of plaintiff's attempt to weaken the holding of Ziglar is to call it a "plurality." Ziglar is not a plurality. Even though the majority included only four justices as to Parts I, II, III, IV-A, and V, that is a majority because only six justices took part in resolving this case – Justices Sotomayor, Kagan, and Gorsuch took no part in resolving the case. Only Justices Breyer and Ginsberg dissented. As to Part IV-B, only three justices joined, making that Part a plurality, with Justice Thomas filing a concurring opinion to opine on Part IV-B. As Part IV-B discusses qualified immunity, that plurality opinion is not relevant here.

More fundamental, however, is that neither the Second Circuit in Tellier nor the district court in Tellier conducted any new context, alternative remedies, and special factors analyses to determine whether there can be a Bivens remedy.  The Supreme Court was quite clear that a threshold question for any court reviewing a Bivens claim is an analysis into whether the court will explicitly recognize a new context.  In fact, Ziglar itself is a vacatur of a Second Circuit decision because the Circuit did not conduct the context, alternative remedies, and special factors analysis.  See Ziglar, 137 S. Ct. at 1865 (vacating the Second Circuit's holding in Turkmen v. Hasty, 789 F.3d 218 (2015) (panel decision); Turkmen v. Hasty, 808 F.3d 197 (2015) (en banc)).  Accordingly, the issue is not whether Ziglar overruled Tellier; rather, it is that Tellier does not speak to the precise issue here, whether the conduct is a new context and whether the Court should recognize a new right under Bivens.

Ziglar has given priority to the need to consider the availability of Bivens relief, even where the Circuit had previously assumed the availability of a Bivens remedy.  That is all that Tellier does – assume the availability of a remedy.  But an assumption is not controlling precedent.  "Constitutional rights are not defined by inferences from opinions which did not address the question at issue."  Texas v. Cobb, 532 U.S. 162, 169 (2001); see also In re Stegall, 865 F.2d 140, 142 (7th Cir. 1989) ("A point of law merely assumed in an opinion, not discussed, is not authoritative.").  In fact, Ziglar requires courts to consider each case individually, even where the court had previously found a new Bivens remedy, just as the Third Circuit recently recognized.  In Vanderklok, the Third Circuit found that, even though it had previously found a Bivens remedy in a First Amendment retaliation context, it nonetheless "must look at the issue anew in this particular context, and as it pertains to this particular category of defendants."  2017 WL 3597711, at *6.

Plaintiff also argues that the Second Circuit had found specifically that he has a claim when the Circuit remanded his case to this Court. The Circuit's opinion does not support plaintiff's argument. The Circuit stated: "Failure to provide an inmate with the procedural protections afforded under 28 C.F.R. § 541.22 after a protected liberty interest attaches *may* constitute a violation of the inmate's right to procedural due process." Gonzalez, 802 F.3d at 223 (emphasis added); see also id. ("As a result, a discrete claim *may* accrue under the Fifth Amendment . . . ."); ("Gonzalez *may* have a timely claim, however, for a violation of his right to procedural due process notwithstanding the inapplicability of the continuing violation doctrine."). First, nowhere does the Circuit say that plaintiff has a claim; instead, it finds a claim "may" exist. Moreover, even this statement itself is dictum by the Circuit, as the Circuit's holding related to the timeliness of any claim, not the substance of the claim, or as relevant here, the availability of a Bivens remedy.

Second, and more importantly, the Second Circuit did not conduct any special factors analysis, as is required. Instead, the Circuit assumed in dictum that there "may" be a cause of action, and as noted above, an assumption that does not reach the issue is not controlling precedent. To be clear, the only substantive issue the Second Circuit reached in 2015 was timeliness, and nothing in that opinion requires this Court to hold that a cause of action exists without first complying with the Supreme Court's explicit mandate that lower courts consider each Bivens claim to determine whether it is a new context.

Given all of the foregoing, I decline to create a new Bivens Fifth Amendment cause of action, and plaintiff's Fifth Amendment claim is dismissed.

## B.      The Eighth Amendment Claim

Plaintiff's Eighth Amendment claim also fails because there is no available <u>Bivens</u> remedy for the conduct at issue.[15]  Although <u>Carlson</u> created a <u>Bivens</u> remedy under the Eighth Amendment, plaintiff's facts are significantly different, and he has failed to establish that his conditions of confinement in the SHU rise to the level of an Eighth Amendment violation.  <u>See, e.g.</u>, <u>Estelle v. Gamble</u>, 429 U.S. 97, 105 (1976) (holding that "deliberate indifference to a prisoner's serious illness or injury" violates constitutional guarantees); <u>Farmer v. Brennan</u>, 511 U.S. 825, 828 (1994) (holding that "deliberate indifference to a substantial risk of serious harm to an inmate" violates constitutional guarantees (internal quotation marks omitted)).

Plaintiff alleges that, during his SHU confinement, (i) he was denied outdoor recreation time and his recreation time was limited to the early morning when it was often still dark outside; (ii) that he often did not receive sufficient cleaning supplies to be able to clean his cell three times a week; (iii) that he was provided with dirty or used clothing; (iv) that he was provided dirty or used razors; (v) that he was denied dental hygienic supplies, ultimately requiring dental attention years after his release from the SHU; and (vi) that he was provided shoes without laces causing a lack of muscle support, which ultimately resulted in a fall and knee injury after he was released from the MDC SHU.  Before considering the availability of a <u>Bivens</u> remedy, it is necessary to divide plaintiff's claims into two groups – the non-medical claims (outdoor recreation time, cleaning supplies, dirty or used razors, and dirty or used clothing) and the medical claims (the non-provision of dental supplies and laced shoes).

---

[15] Plaintiff argues that defendants have not asserted, and therefore have waived, any argument that his Eighth Amendment claim was in any way affected by <u>Ziglar</u>.  Defendants' failure to argue this point does not prevent this Court from considering the argument.  The Supreme Court's opinion is fairly read as ordering lower courts to evaluate whether <u>Bivens</u> remedies are available as a necessary precursor to analyzing the merits of the <u>Bivens</u> claims themselves.

As to the non-medical claims, there is no Bivens remedy available. Although the Supreme Court recognized a Bivens remedy under the Eighth Amendment in Carlson, this does not mean all Eighth Amendment claims have a Bivens remedy. See Ziglar, 137 S. Ct. at 1864 ("[E]ven a modest extension [of Bivens] is still an extension."); Hernandez v. United States, 757 F.3d 249, 272 (5th Cir. 2014) (noting that courts do not extend Bivens "amendment-by-amendment"); Wilson v. Libby, 498 F. Supp. 2d 74, 86 (D.D.C. 2007) ("Bivens actions are not recognized Amendment by Amendment in a wholesale fashion. Rather, they are context-specific."). Looking at the context of the non-medical claims, we are very far from the facts of Carlson. There, the Supreme Court held that the Eighth Amendment gave a prisoner's estate a monetary remedy because the federal jailers caused the prisoner's death by failing to treat his asthma.

Here, the deprivations, if one can even call them that, are vastly less serious. Plaintiff's limitation to recreation at 6:00 a.m. when it was often still dark, receipt of laundered used clothes that sometimes still had stains, receipt of dirty razors, and lack of cleaning supplies are not of the type of claims that the Eighth Amendment is meant to remedy, much less in the Bivens context. Thus, it is obvious that the non-medical claims present facts that are very different from Carlson, such that it is a "new context."

I do not need to go far to find that plaintiff had alternative remedies to Bivens – the BP-9 complaints, which he used – sometimes successfully, for example, to procure a new mop. In addition to the special factors counseling hesitation already outlined as to the Fifth Amendment claim, which apply with the same force here, there is the additional factor that plaintiff's Eighth Amendment allegations are petty and nowhere near the substantially serious conduct the Supreme Court has recognized in Carlson. Plaintiff's Eighth Amendment claim is so weak that

the analysis of whether a <u>Bivens</u> claim may be found and whether the conduct is sufficiently serious under the Eighth Amendment somewhat collapse into each other.

To establish a violation of the Eighth Amendment, a plaintiff must demonstrate that, (1) objectively, the deprivation that the inmate suffered was "sufficiently serious that he was denied the minimal civilized measure of life's necessities," and (2) subjectively, the defendant official acted with "a sufficiently culpable state of mind . . . , such as deliberate indifference to inmate health or safety." <u>Gaston v. Coughlin</u>, 249 F.3d 156, 164 (2d Cir. 2001) (quoting <u>Farmer</u>, 511 U.S. at 834 (internal quotation marks omitted)). I simply cannot find that the non-medical claims present a deprivation that was "sufficiently serious" such that plaintiff "was denied the minimal civilized measure of life's necessities." Accordingly, plaintiff's Eighth Amendment <u>Bivens</u> claim arising from the non-medical claims is dismissed.

As to the medical claims, plaintiff comes somewhat closer to the ambit covered by <u>Carlson</u>; however, the facts are again so dissimilar such that the context is new, which requires me to conduct an alternative-remedies and special-factors analysis. In doing so, I once again find that a <u>Bivens</u> remedy is inappropriate. First, plaintiff had alternatives to remedy his medical concerns, <i>i.e.</i>, the administrative complaint system, and there is no evidence that plaintiff brought any complaints regarding dental problems or muscle problems to the attention of anyone. This is because these issues did not arise when he was in the SHU; they arose much later. In evaluating the special factors, I incorporate the previous special factors already identified that counsel against creating a <u>Bivens</u> remedy.

Additionally, just as I noted with the non-medical claims, the lack of merit to the medical claims and whether to find a remedy merge to weigh against the creation of a <u>Bivens</u> remedy. Although an individual has a constitutional right to medical treatment, plaintiff's allegation – that

defendants' denial of dental hygiene supplies caused plaintiff to develop a cyst requiring surgical removal in 2005, three years after he left the SHU – is conclusory. The same is true of plaintiff's conclusory claim that unsupported shoes led to his muscle deterioration, which caused his fall and subsequent knee injury (a fall and injury that also occurred well after his release from the SHU).

Even if I accepted the unsupported conclusions that the cyst and knee injury were the results of the non-provision of dental hygiene products and laced shoes during his detention in the SHU from February 28, 1999, until April 15, 2002, and considered them together, plaintiff's medical claims are still not objectively serious enough to raise an Eighth Amendment violation, as is one of the two required elements of an Eighth Amendment violation. And again, even if I accepted, *arguendo*, that the violations were objectively serious, plaintiff still fails to make out a claim because of the absence of the second element of an Eighth Amendment violation – there is no simply no evidence that, during his custody in the SHU, defendants had sufficiently culpable states of mind with respect to the dental supplies and lace-less shoes. Plaintiff's argument that he informed defendants of the "improper conditions he was suffering in the SHU" is not sufficient. This vague allegation does not specify which conditions plaintiff relayed to each defendant, much less the defendant's response. For these reasons, there is no <u>Bivens</u> remedy for plaintiff's Eighth Amendment medical claims.

## CONCLUSION

Accordingly, defendants' motions for summary judgment [185] [191] are granted.  The Clerk is directed to enter judgment dismissing the complaint.

**SO ORDERED.**

_____
                                                    U.S.D.J.

Dated: Brooklyn, New York
        September 18, 2017